1  GREGORY R. MCCLINTOCK - State Bar No. 43987
   gmcclintock@glaserweil.com
2  FRED D. HEATHER - State Bar No. 110650
   fheather@glaserweil.com
3  NOAH PERCH-AHERN - State Bar No. 262164
   nperchahern@glaserweil.com
4  GLASER WEIL FINK JACOBS
       HOWARD AVCHEN & SHAPIRO LLP
5  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
6  Telephone: (310) 553-3000
   Facsimile: (310) 556-2920
7
8  Attorneys for Plaintiff
   MGP IX LINCOLN STATION, LLC
9
10          UNITED STATES DISTRICT COURT

11          CENTRAL DISTRICT OF CALIFORNIA

12  MGP IX LINCOLN STATION, LLC, a          **Case No.** CV12-8239-PA (FFMx)
    Delaware limited liability company,
13                                           Assigned to: Hon. Percy Anderson
                Plaintiff,
14                                           **PLAINTIFFS AND COUNTER-**
    v.                                       **DEFENDANT MGP IX LINCOLN**
15                                           **STATION, LLC'S PROFFER OF THE**
    CITY OF CERRITOS, a California,          **EXPERT OPINIONS OF JEFF**
16  municipal corporation; and DOES 1- 10,   **DAGDIGIAN**
17              Defendants.
18  ─────────────────────────────────
    CITY OF CERRITOS,
19
                Counter-Claimant,
20                                           **Trial:**
    v.                                       Date:    March 25, 2014
21                                           Time:    9:00 a.m.
    MGP IX LINCOLN STATION, LLC, a          Courtroom: 15
22  Delaware limited liability company,
23              Counter-Defendants.
24
25
26
27
28

*(left margin, vertical)* Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Plaintiff and Counter-defendant MGP IX Lincoln Station, LLC ("MGP") hereby submits, pursuant to the Court's In Chambers – Order, dated February 21, 2014, its Proffer of Dr. Jeffrey V. Dagdigian's Expert Opinions ("Proffer").  MGP's Proffer sets forth below: (I) each of Dr. Dagdigian's expert opinions that will be given at trial, including the basis and relevance of each expert opinion; and (II) an identification of each document, by title, author, and date, relied on by Dr. Dagdigian in forming his opinions.  Dr. Dagdigian did not rely on any statements of persons in formulating his opinions.  As agreed with by the Court clerk, the documents relied on by Dr. Dagdigian have been submitted to the Court on a CD in electronic format that is being filed manually concurrently herewith.  Dr. Dagdigian's curriculum vitae is attached hereto as **Exhibit 472**.  The Expert Report and Rebuttal Report identifying Dr. Dagdigian as MGP's expert are attached hereto as **Exhibits 445 and 130**, respectively.

## I.   OPINIONS SET FORTH IN DR. DAGDIGIAN'S EXPERT REPORT

The following opinions are set forth in Dr. Dagdigian's expert report, attached hereto as **Trial Exhibit 445.**

### A.   **Principal Expert Opinions**

**1.   Opinion 1: PCE has been found to exist in soil and PCE, TCE and 1,4-dioxane have been found to exist in the underlying groundwater at the Lincoln Station Shopping Center ("the Property")  at concentrations that are orders of magnitude higher than the MCLs or other regulatory limits that federal and state agencies have determined do not pose a risk to human health or the environment.**

**a.   Basis for Opinion 1:**

The basis for Opinion 1 is the results of soil and groundwater sampling that began in 1999 and as of September 2013 had been performed at 77 grab sample locations and 12 monitoring wells. The area of sampling extends from the commercial

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  property located north of South Street on the north to south of the residences on

2  Wyeth Drive on the south, and the full width of the Property from the east to west.

3      The grab sample locations included 22 single-depth samples collected from the

4  first encountered groundwater and 55 multi-depth locations where up to five different

5  depth intervals (up to a total depth of 54 feet bgs) were sampled. The 12 monitoring

6  wells are screened to total depths from 20 to 35 feet bgs.

7      The evaluation of groundwater contamination was performed using primarily

8  the results of the more recent (2007 to date) depth-discrete grab samples because

9  these represent the most recent and depth-discrete concentrations detected within each

10 of the particular groundwater zones.  In total, this amounted to 55 locations and 198

11 individual groundwater samples.

12                    **b.      Relevance of Opinion 1:**

13     This opinion is relevant to the case because it establishes that there has been a

14 release of hazardous substances at the Property, and the results of the environmental

15 investigation and associated plume maps provide the most likely explanation for how

16 PCE contaminated the soil at the Property and TCE and PCE got into the Sewer Line

17 and were therefore able to leak out of the Sewer Line and contaminate the

18 groundwater underlying the Property.[1]  Thus, this opinion is also relevant in that it

19 helps establish that there was a release of hazardous substances from the Sewer Line

20 owned and operated by the City, and that there has been a release at the Property

21 which is owned and operated by the City.  It is also relevant to help show that the City

22 cannot establish the third party defense under CERCLA; specifically, the City cannot

23 establish that it used due care given that its Sewer Line contributed and caused the

24 contamination at issue and/or given its management of the Property.  This opinion is

25

26 [1] Where testimony such as the foregoing is relevant to establishing MGP's 42 U.S.C.
   §9607(a) cost recovery claim, it is additionally relevant to establishing MGP's claim
27 for contribution/indemnity pursuant to California's Carpenter-Presley-Tanner
   Hazardous Substances Account Act ("HSAA") §25300 et seq.

28

1  also relevant to a number of MGP's affirmative defenses, including unclean hands,

2  waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys'

3  fees improper, compliance with all laws, and bona fide prospective purchase.   It is

4  relevant to these affirmative defenses because, among other things, it helps establish

5  that the City's conduct caused the contamination at issue and that MGP should not

6  bear any costs or liabilities associated with such contamination.

7  **2.   Opinion 2:  The chlorinated solvents that have impacted the**

8  **Property originated from two separate sources: PCE from**

9  **Crown Cleaners and TCE from S&J Chevrolet ("S&J"),**

10  **both of which were previous occupants of the Property. The**

11  **PCE originated from spillage or discharge onto the concrete**

12  **floor near the dry cleaning machine and into a floor drain or**

13  **floor sink at Crown Cleaners that were connected to an on-**

14  **site lateral that connected the Property to the City's sewer**

15  **line in South Street ("Sewer Line"). The TCE originated**

16  **from discharges of metal degreasing and other solvent-**

17  **containing fluids into drains or a sump at S&J that were**

18  **connected to an on-site lateral that also connected to the**

19  **Sewer Line. No other sources of chlorinated solvents have**

20  **been found to exist at the Property or at any other location**

21  **that could have impacted the Property.**

22  **a.   Basis for Opinion 2:**

23  The Property was used as an automobile dealership that included vehicle repair

24  and maintenance facilities (Allison Specialists, S&J Automotive, and S&J Chevrolet)

25  from the 1950s through 1981 with some operations appearing to have continued on

26  the Property until the late 1980s. S&J Chevrolet and Allison Specialists operated as a

27  full-service automotive dealership with automotive repair from 1949 to approximately

28  1981, before relocating to the "Cerritos Auto Square" area on the west side of I-605.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Based on a review of facility maps and building permits, it appears that the dealership conducted automotive sales, automobile and truck repair, and auto body repair, including painting.

As an automotive repair facility, it is likely that S&J used solvents, including TCE, in their parts cleaning operations and that these hazardous wastes were commonly disposed to the sewer.  S&J was issued an Industrial Wastewater Discharge Permit in September of 1976. In this permit, they were instructed to "continue the program of regular clarifier maintenance and cleaning at intervals frequent enough to prevent a build-up of grit, oil, or grease which may enter the sewer."  S&J was cited for "an illegal and unsafe paint mixing room near a paint spray booth" in 1955 and had a permit for a repair garage dating back to 1965.

Crown Cleaners operated in tenant suite 114 on the Property from approximately 1989 to 1999.  A Permit to Operate was issued on December 26, 1989 by the SCAQMD for one "Synthetic Solvent Dry Cleaning Unit, Renzacci, Model Serena Sun 530, with a built-in Refrigerated Vapor Condenser."  On August 30, 1999, the dry cleaner vacated the tenant space, removing all dry-cleaning machinery, process lines,  equipment, and chemicals.

The dry cleaning equipment was located in the southwestern corner of Unit 114.  A boiler was located in the south central part of the tenant space with a floor drain (floor sink) immediately northeast of the boiler.  The back entrance to the tenant space and the bathroom were located in the southeastern corner of Unit 114.

On-site dry cleaning operations occurred from early 1990 to 1999.  The dry cleaning equipment was approved for operation on December 26, 1989.  Dry cleaning operations were terminated in 1999 and all equipment was removed by August 1999. The last waste disposal manifest for Crown Cleaners was dated August 13, 1999.

PCE is the primary dry cleaning chemical used in the United States. Based on manifests and the SCAQMD dry cleaning equipment permit, PCE was used in the dry cleaning operations at Crown Cleaners.  Other chemicals may have also been used in

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1    spot-treating but no records exist to confirm this.

2        TCE is not typically used in dry cleaning operations, though it has been used as

3    a paint, oil and grease carrier solvent for spotting agents.

4        Copies of waste manifests were obtained from the DTSC for waste generation

5    in 1997 and 1998.  Although copies weren't available for 1995 or 1996, a manifest

6    summary was available for review.  Fifteen to 23 gallons of PCE waste were

7    manifested at Crown Cleaners approximately every six months from 1995 through

8    1999.  Filters were manifested once during that time period.

9        In a 1998 pre-acquisition Phase I Environmental Site Assessment (ESA)

10   performed by EMG for Bixby, the consultant observed evidence of PCE staining on

11   the floor near the dry cleaning equipment.  EMG also noted that property

12   management was obtaining proposals for epoxy coating for the floor and for the

13   installation of secondary containment for the dry cleaning equipment.

14                   **b.**     **Relevance of Opinion 2:**

15       This opinion is relevant to the case because it establishes that there has been a

16   release of hazardous substances at the Property.  Although the location of the

17   contamination plume is itself sufficient to establish a release from the Sewer Line, the

18   evidence regarding operations and hazardous materials handled at the Property supply

19   additional evidence that helps establish a release from the Sewer Line.  Thus, this

20   opinion is also relevant in that it helps establish that there was a release of hazardous

21   substances from the Sewer Line owned and operated by the City, and that there has

22   been a release at the Property which is owned and operated by the City.  It is also

23   relevant to help show that the City cannot establish the third party defense under

24   CERCLA; specifically, the City cannot establish that it used due care given that its

25   Sewer Line contributed and caused the contamination at issue and/or given its

26   management of the Property.  This opinion is also relevant to a number of MGP's

27   affirmative defenses, including unclean hands, waiver, third party defense, equitable

28   allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

        **3.**      **Opinion 3: The spill or discharge of PCE onto the concrete floor near the dry cleaning machine at Crown Cleaners resulted in a relatively small release to the underlying soil and groundwater; however, it was large enough to require a response.**

This PCE release was properly and completely characterized in the soil gas, soil, and groundwater matrices at the Property.

Soil gas and soil sampling revealed the presence of PCE contamination directly below the stained concrete floor near the dry cleaning machine.

Shallow groundwater sampling up-gradient and down-gradient from the location of the spillage or discharge onto the concrete floor demonstrated that the PCE release to the soil had reached the groundwater; however, the groundwater was not significantly impacted.

Soil Vapor Extraction mitigation measures implemented by Bixby Lincoln were successful in removing PCE from the soil and soil gas, and indirectly from groundwater.  Had there been no other contamination at the Property, Bixby would have likely received a "no further action" letter from the LACFD or the RWQCB for all environmental media. At most, a small amount of shallow soil would have been required to be excavated to receive a "no further action" letter.

Subsequent groundwater sampling detected additional higher concentrations of PCE and TCE in the groundwater up-gradient from the dry cleaners. Additional testing requested by the RWQCB confirmed that there was another (up-gradient) source. The RWQCB concluded that PCE and TCE were released from the Sewer Line and were impacting the Property. Because of this conclusion, the RWQCB

1  rejected site closure with respect to the release from Crown Cleaners and requested
2  further site characterization activities.

### a.   Basis for Opinion 3:

4  Subsurface investigations began at the Property in 1998.  These investigations
5  were performed by Environmental Support Technologies (EST) from 1998 to 2006,
6  Geosyntec Consultants ("Geosyntec") from 2007 to 2011, and TOR Environmental
7  from 2011 to the present. The Property investigations have been overseen by the Los
8  Angeles Regional Water Quality Control Board since 2000 as Case #0921.

9  In January 1998, Environmental Support Technologies (EST) installed soil gas
10  probes at eight locations under the former dry cleaner and two locations
11  approximately 10 feet south of the former dry cleaner; EST collected ten 5-foot deep
12  and two 15-foot deep soil gas samples for on- Site analysis of VOCs.

13  The results of the 1998 investigation indicated the presence of PCE ranging
14  from 8 to 17,700 µg/L in soil gas under the former dry cleaner location.  Based on the
15  results of the soil gas analyses, four soil borings were advanced to 5 feet below
16  ground surface, and soil samples were collected at 1 and 5 feet below grade. PCE was
17  detected in soil at concentrations ranging from 0.230 to 55 milligrams per kilogram
18  (mg/kg) at 1 foot below grade.   The highest PCE concentrations were detected close
19  to the dry cleaning machine and near the boiler room at the back of the dry cleaner
20  facility, approximately 1 foot below grade.

21  In July 1998, EST installed two vapor extraction wells at the Site screened at 3
22  feet to 10 feet below grade (top of concrete floor slab). Beginning on August 3, 1998,
23  extracted soil vapor was treated by carbon adsorption and the system was operated
24  until November 12, 1998, when the system began to extract groundwater due to a
25  rising groundwater table.  The system was restarted several times after repairs, and
26  restarted in January 1999 with a third extraction well located adjacent to a boring
27  where the highest PCE concentrations were detected in soil.  This well was screened
28  from 1 foot to 5 feet below grade. Groundwater continued to be pulled into the wells,

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

7

1    and the system was shut down on February 28, 1999.  The treatment system was

2    demobilized and removed in April 1999.

3          Concentrations of total VOCs in the influent to the SVE system were initially

4    in the range of 150 parts per million (ppm) at the beginning of remediation and

5    asymptotically dropped to the range of 2 to 10 ppm at the time the system was

6    removed.  EST collected interim soil gas and soil samples from the Site in October

7    1998; analytical results indicated significant reduction in PCE concentrations at

8    locations that were previously sampled in January 1998.

9          Additional soil samples were collected from beneath the former dry cleaner

10   facility in November and December 1999 to evaluate post-remediation concentrations

11   of PCE in soil.  Based on the concentrations of PCE in the soil and groundwater at

12   and down-gradient from Crown Cleaners in 2000, it is likely that the RWQCB would

13   have granted closure if there had been no release at the Sewer Line.  This closure

14   would have been issued because the soil vapor extraction remediation was successful

15   and reduced concentrations of PCE in soil and soil vapor, as well as indirectly

16   remediating groundwater beneath the Property.  The remaining concentrations of PCE

17   in soil were not likely to negatively impact groundwater as demonstrated by the

18   application of the VOC attenuation factor method calculations in the 1996 RWQCB

19   Remediation Guidance for Petroleum & VOC Impacted Sites.  The remaining

20   concentrations in groundwater were within one order of magnitude of the MCL.

21          **b.    <u>Relevance of Opinion 3:</u>**

22          This opinion is relevant to the case because it supports MGP's contention that

23   the release of PCE to the soil at Crown Cleaners was a relatively minor event that was

24   fully remediated by Bixby and that the significant groundwater contamination that

25   underlies the property is from an upgradient source that has been identified by the

26   regulatory oversight agency as the Sewer Line.  Thus, this opinion is also relevant in

27   that it helps establish that there was a release of hazardous substances from the Sewer

28   Line owned and operated by the City, and that there has been a release at the Property

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

8

860196

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   which is owned and operated by the City.  It is also relevant to help show that the City

2   cannot establish the third party defense under CERCLA; specifically, the City cannot

3   establish that it used due care given that its Sewer Line contributed and caused the

4   contamination at issue and/or given its management of the Property.  This opinion is

5   also relevant to a number of MGP's affirmative defenses, including unclean hands,

6   waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys'

7   fees improper, compliance with all laws, and bona fide prospective purchase.   It is

8   relevant to these affirmative defenses because, among other things, it helps establish

9   that the City's conduct caused the contamination at issue and that MGP should not

10  bear any costs or liabilities associated with such contamination.

11          **4.      Opinion 4.  Virtually all of the PCE that has been found to**

12          **exist in groundwater at the Property originated from PCE**

13          **that was discharged into the floor drain or floor sink at**

14          **Crown Cleaners that were connected by a lateral to the**

15          **Sewer Line. That PCE was released into the environment**

16          **(soil and then groundwater) through cracks and other**

17          **defects in the Sewer Line.**

18          a.      **Basis for Opinion 4:**

19  Circumferential cracks were identified during video inspections of the sewer

20  pipe performed in 2010. There were no other connections or inlets to the Sewer Line

21  identified upstream of the Lincoln Station Shopping Center or the former S&J and

22  Crown Cleaners.

23  Based on the distribution of chemicals found in the groundwater and the

24  elevated concentrations of TCE and PCE found immediately beneath and

25  downgradient of the Sewer Line, it is clear that significant releases of TCE and PCE

26  occurred from the Sewer Line in the area downstream of Manhole No. 2.

27  Based on the additional distance and depths to which the TCE plume has

28  migrated, combined with evidence that the TCE is not a result of the degradation of

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

PCE, the release date of TCE from the sewer preceded that of PCE, which is consistent with the different time periods during which S&J and Crown Cleaners occupied the Property.

**b.** **Relevance of Opinion 4:**

This opinion is relevant to the case because it provides the most likely explanation for how PCE got into the Sewer Line, where it was able to leak into the underlying soil and groundwater through defects in the Sewer Line. This opinion is relevant to the case because it establishes that there has been a release of hazardous substances at the Property. Although the location of the contamination plume is itself sufficient to establish a release from the Sewer Line, the evidence regarding operations and hazardous materials handled at the Property supply additional evidence that helps establish a release from the Sewer Line. Thus, this opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City. It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property. This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase. It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

**5.** **Opinion 5. Virtually all of the TCE that has been found to exist in groundwater at the Property originated from TCE that was discharged into drains or a sump at S&J that was**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**also connected by a lateral to the Sewer Line. That TCE was released into the environment (soil and groundwater) through cracks and other defects in the Sewer Line. The 1,4-dioxane that exists in the groundwater at the Property is a stabilizer that was used to keep TCE from degrading and undoubtedly originated from the same source.**

S&J conducted automotive repair and body shop operations on the Property. TCE was commonly used as a degreaser in automotive repair and body shop operations during the time period S&J occupied the Property.

The TCE plume in groundwater on the Property is larger than the PCE plume. Since PCE and TCE migrate in groundwater at comparable rates, a larger TCE plume is indicative of an older TCE release. The relative sizes of the TCE and PCE plumes are consistent with the difference in time periods between when Crown Cleaners and S&J occupied the Property.

The TCE concentrations in groundwater on the Property are significantly higher than the PCE concentrations. Thus, the presence of an aerobic environment and the absence of significant amounts of PCE and TCE degradation products in the groundwater indicate that the TCE is not present as a result of PCE degradation or dechlorination and results from a separate release.

Significant levels of 1,4-dioxane were found in the groundwater beneath the Sewer Line. 1,4-dioxane is a known stabilizer for TCE and confirms that the TCE was released separately from the PCE. In addition, 1,4-dioxane is a known additive in automotive brake cleaners, which are also known to contain chlorinated solvents.

TCE may be used in limited quantities as a spot cleaner in a dry cleaning operation but it is not normally used in large quantities in dry-cleaning operations.

No TCE or very small concentrations of TCE were found in the soil beneath the dry cleaning machine at Crown Cleaners. This indicates that TCE was not present with the PCE originating from Crown Cleaners. These observations support the

1   conclusion that the TCE was introduced into the Sewer Line as a result of its use at a

2   separate location.

3               a.      **Basis for Opinion 5:**

4        Groundwater conditions and chemical data show that no significant

5   dechlorination is occurring and that the PCE and TCE found in the groundwater at the

6   Property are from separate releases from the Sewer Line. The analytical results show

7   a lack of significant concentrations of chemical daughter products such as DCE, vinyl

8   chloride, ethene, and ethane that would be formed by the reductive dechlorination of

9   PCE and TCE. In addition, if dechlorination were occurring, the groundwater would

10  typically show evidence of reducing conditions. Based on the relatively infrequent

11  and, when present, relatively low concentrations of these daughter products, in

12  conjunction with the aerobic conditions in the groundwater, it is virtually certain that

13  the high concentrations of TCE in groundwater are from a separate release and not

14  from the degradation of PCE.

15       In addition, the microorganisms that dechlorinate PCE and TCE require

16  anaerobic conditions and will not function under aerobic/oxidizing conditions. At a

17  minimum, iron reducing conditions are needed to support the microorganisms that

18  carry out the initial dechlorination steps of PCE and TCE.

19       To study the groundwater conditions as they relate to the potential

20  dechlorination of PCE and TCE, Geosyntec performed field measurements and

21  collected groundwater samples for geochemical analysis in May 2008. The conditions

22  in the saturated zone were found to be primarily aerobic as evidenced by mostly

23  positive field measurements of oxidation/reduction potential (ORP) and

24  concentrations of dissolved oxygen (DO). Furthermore, no dissolved iron, methane,

25  ethane, or ethene were detected in the samples and nitrate and sulfate concentrations

26  did not decrease along the pathway of groundwater flow direction. These conditions

27  are not conducive to the reductive dechlorination of PCE and TCE.

28       Geosyntec concluded that: 1) the aerobic groundwater conditions together with

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

the lack of significant vinyl chloride and ethene concentrations confirmed that the dechlorination of PCE and TCE is not occurring at the Property; and 2) The presence of high concentrations of TCE in the study area were therefore likely the result of a release of TCE from the Sewer Line.

Dechlorination of PCE results in the formation of TCE and the subsequent daughter products in decreasing concentrations.  When PCE is degraded in the environment, the amount of TCE formed is normally significantly less than the amount of PCE left in the environment.  When anaerobic conditions are operative, the concentration of TCE is a small fraction of the PCE concentration.  Additionally, under aerobic conditions, PCE degradation is very slow or does not occur.

When TCE is found at significantly greater concentrations than PCE, one can conclude that the TCE is not a result of the degradation of PCE.  The maximum concentration of TCE found in groundwater (14,500 ug/L) compared to that of PCE (7,500 ug/L) is inconsistent with the degradation of PCE and shows that the TCE is from a separate source.

With respect to 1,4-dioxane, the chemical was detected in groundwater from approximately 400 to 4,000 ug/L at sample locations extending from South Street to the center of the Property.  Not all groundwater samples were analyzed for 1,4-dioxane, so its extent has not been fully defined, but its presence is an important consideration as it relates to the other chemicals found in groundwater.  1,4-dioxane was used widely as a stabilizer in numerous solvents and chemical products, particularly for 1,1,1-TCA.  1,4-dioxane was known to be used as a TCE stabilizer prior to 1980 and was also cited as a stabilizer for TCE in a 1983 U.S. patent.   1,4-dioxane may also be associated with some PCE/1,1,1-TCA-based automotive products, such as brake cleaning solutions.

In addition, a recent paper suggests that 1,4-dioxane can occur as a common co-contaminant in groundwater with TCE.  Studies performed by the U.S. Air Force Center for Environmental Excellence at 49 installations where testing was performed

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

for both TCE and 1,4- dioxane have found that 1,4-dioxane is a common co-contaminant in groundwater with TCE. The study found that 64% of all 1,4-dioxane detections were associated with TCE independent of 1,1,1-TCA. See also the basis for Opinions 2 and 3 above.

**b.     Relevance of Opinion 5:**

This opinion is relevant to the case because it provides the most likely explanation for the difference in concentrations and relative sizes of the TCE and PCE plumes that are impacting the Property, as well as the presence of 1,4-dioxane contamination. This opinion is relevant to the case because it establishes that there has been a release of hazardous substances at the Property. Although the location of the contamination plume is itself sufficient to establish a release from the Sewer Line, the evidence regarding operations and hazardous materials handled at the Property supply additional evidence that helps establish a release from the Sewer Line. Thus, this opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City. It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property. This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase. It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

**6.     Opinion 6: The conclusion that cracks and other defects in the City's Sewer Line are the source of the PCE, TCE and**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

**<u>1,4-dioxane that has been released into the environment and has contaminated groundwater at the Property is supported by, among other evidence, the following factors:</u>**

- The highest concentrations of PCE and TCE in groundwater are located directly under or shortly down-gradient from three circumferential cracks that have been identified in the Sewer Line, a location in that line that is just downstream from the point where the sewer laterals that serviced S&J and Crown Cleaners were connected to the Sewer Line.

- The differences in vertical and horizontal distribution of PCE and TCE in groundwater, as well as the relative locations and concentrations of the two chemicals, are consistent with the Sewer Line being the source and with releases of the chemicals from the Sewer Line at the different times that Crown Cleaners and S&J occupied the Property.

- There are no other on-site or off-site facilities that are known to or are likely to have used PCE or TCE in their operations located either upstream of the circumferential cracks in the Sewer Line or up-gradient of South Street, and concentrations of PCE and TCE just up-gradient from the Sewer Line rapidly decrease, both of which circumstances are inconsistent with the existence of another or a different source.

- The lateral sewer lines on the Property, including the line that serviced Crown Cleaners, have been inspected; no defects were found and the lines, which are newer than the Sewer Line and composed of superior materials, were found to be in good condition.

- Subsurface conditions are consistent with separate releases of

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   PCE and TCE from the same location rather than degradation of
2   the PCE to TCE -- namely an aerobic soil environment, the
3   existence of higher concentrations of TCE than PCE, and a
4   larger plume of TCE than PCE.

5        a.     **Basis for Opinion 6:**

6        (1)     **Potential On-Site and Off-Site Sources.**

7   Waterstone conducted a thorough investigation of available information regarding all
8   of the on-site operations and  nearby off-site properties that conceivably could have
9   contributed to the plumes of contamination impacting the Property.   No on-site
10  sources other than S&J and Crown Cleaners were identified.   The off-site sources
11  investigated include the following:

12       (2)     **Yesterlaid Farms/Pioneer Mills (Egg Farm).**
13  Pioneer Mills and Yesterlaid Farms, an egg processor and sales location, was located
14  at 11855 South Street from at least the 1940s through 1986. This facility was located
15  north of the Property, beyond South Street. This facility received an industrial
16  wastewater discharge permit from Sanitation Districts of Los Angeles County in 1975
17  for the discharge of detergent and liquids from broken eggs. The facility also received
18  a notice of violation in August 1975 for the  disposal of a large quantity of egg shells
19  to the Sewer Line.  It is not likely that this facility used chlorinated solvents in their
20  operations.

21       (3)     **Artesia Lumber Company/Barr Lumber**
22  **(Lumberyard).**  Artesia Lumber Company was identified at 18810 Pioneer
23  Boulevard as early as 1910.  This facility was located on the east side of Pioneer,
24  south of the railroad tracks and north of the Property beyond South Street. Historical
25  city directories indicate that this business was known as Barr Lumber in the 1960s
26  and left this address by 1970. This facility is not listed in any regulatory databases. It
27  is unlikely that this facility used chlorinated solvents in their operations.

28       (4)     **Drycleaners.**  There are several dry cleaning

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

businesses in the vicinity of the Property as described below.

- **Upgradient Drycleaners**.   One dry cleaning facility, Martell Cleaners at 18518 Pioneer Boulevard, was identified 0.35 miles north and up-gradient of the Property. This facility has operated at this location for approximately 50 years. The dry cleaning facilities and related operations were performed at the site from 1950 to 2003 and Martell began operations in 1957.  Martell has since relocated to 12025 South Street, east of the Property. A soil gas and indoor air investigation was conducted at Martell Cleaners in 2009 and groundwater monitoring was conducted quarterly through November 2009. PCE was detected in all three groundwater monitoring wells, with the highest concentrations (up to 14,700 ug/L) in monitoring well MW-2, which is located approximately 0.32 miles north of the Subject Property.

- **Downgradient/Cross-gradient     Drycleaners**. Four dry cleaning facilities were identified down- or cross-gradient of the Property.

  ➢    KLM Cleaners at 11938 ½ South Street is located immediately east beyond the railroad tracks and down-gradient of the Property. This facility has not been identified in regulatory databases other than as a RCRA-Small Quantity Generator.

  ➢    Weavers Dry Cleaner/Wells Fine Dry Cleaning/Rick's Cleaners at 19117 Pioneer Boulevard is located approximately 700 feet west-southwest and cross-gradient of the Property.   This facility has not been identified in regulatory databases.

  ➢    NS Cleaners/Du Rite Cleaners at 12145 South Street is located approximately 0.35 miles east and cross-gradient of

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

the Property. This facility has not been identified in regulatory databases.

> Continental Cleaners at 11450 South Street is located approximately 0.35 miles west and cross-gradient of the Property. This facility received case closure in 2001 from the Los Angeles County Fire Department.

None of these dry cleaners are in a location that corresponds with the location of the PCE plume of contamination impacting the Property and its highest concentrations.

**(5)** <u>**Automotive Fueling and Service.**</u>  There are several automotive fueling and repair businesses in the vicinity of the Property.

• Pep Boys Auto at 11944 South Street is located immediately east beyond the railroad tracks and down-gradient of the Property. This facility performs automotive repairs and is not identified in any leak or spill regulatory databases.

• Los Angeles County Fire Station #30 at 19030 Pioneer Boulevard is located 240 feet west and cross-gradient of the Property. According to the Geotracker database, this facility received case closure in April 2004 as a leaking underground storage tank (LUST) site with fuel impact to soil.

• Holmes Bros. Service Station at 11805 South Street is located approximately 500 feet west-northwest and cross-gradient of the Property. According to the Geotracker database, this facility received case closure in November 1996 as a LUST site with gasoline impact to soil only.

• Bouma Union Service/Shafer Towing/King's Auto & Body Shop/Turners Transmission/ at 12005 and 12015 South Street is located approximately 800 feet east and crossgradient of the

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Property. According to the Geotracker database, this facility received case closure in May 2005 as a LUST site with gasoline impact to the aquifer.

**(6)** **Alco Chemical.** Alco Chemical Company was formerly located at 19220 Pioneer Boulevard, Artesia, CA, approximately 500 feet south-southwest and down-gradient of the Property. Alco operated at this location from at least 1964 through 1972. An Application for an Industrial Waste Disposal Permit was completed on March 16, 1972. This company was a pesticide formulator and, according to the permit, would discharge approximately 25 gallons of solvents per day produced by cleaning pumps and clearing lines from various solvent tanks. The rinsewater flowed through a floor drain to an underground leaching bed. Although this facility also used solvents, it is located down-gradient of the Property and likely discharged to a separate sewer line.

**(7)** **Artesia Implement.** Artesia Implement and Parts Company was formerly located 18824 Pioneer Boulevard, approximately 400 feet north-northwest and up-gradient of the Property. This business operated from at least 1964 through 1985. An Application for an Industrial Waste Disposal Permit was completed on January 31, 1969.

This company conducted the sales and service (including overhauling and painting) of industrial implements (tractors and other farming equipment). According to the permit application, they would discharge oil, mud, and water from steam cleaning activities to the sewer. By 1985, the property had been razed and industrial waste was no longer being discharged.

This facility is not listed in any regulatory databases. It is unlikely that this facility used chlorinated solvents in their operations.

Integrity of the On-Site Laterals: The sewer system at the Property consists of a network of four branch laterals leading northward across the center of the Property joining into a common lateral before connecting to the Sewer Line at Manhole 1. The

Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

connecting sewer line originating at Crown Cleaners travels east beneath the building and enters the second branch lateral traveling north.  The western buildings at the Property are serviced by a second lateral located along the western edge of the Property. This lateral enters the South Street Sewer Line at Lateral C.

These lateral sewer lines were installed in approximately 1989 when Lincoln Station was constructed. According to building plans, the Lincoln Station sewer lines are constructed of 4-inch and 6-inch diameter ductile iron pipe (DIP) with a vertical fall of one percent.  However, a very recent video inspection conducted by Empire for the City indicates that the laterals are actually constructed of A.B.S., which is a superior product, involving longer pipe sections connected by glued joints, that are less susceptible to leakage.  No leaks or defects were detected.

The Lincoln Station lateral sewer lines were also inspected by Roto-Rooter on behalf of Geosyntec on August 3, 2010.  Roto-Rooter concluded that there were no cracks or breaks throughout the areas where the pipe could be visually inspected. Portions of the pipe could not be inspected due to heavy sludge, scale or water.  See also basis for Opinion 5 above.

**b.   Relevance of Opinion 6:**

This opinion is relevant to the case because it explains the basis for MGP's contention that the Sewer Line is the source of the plumes of groundwater contamination impacting the Property and why other off-site sources or the on-site lateral sewer lines at the Property can be eliminated as possible sources.  This opinion is relevant to the case because it establishes that there has been a release of hazardous substances at the Property.  Although the location of the contamination plume is itself sufficient to establish a release from the Sewer Line, the evidence regarding the implausibility of other potential sources supplies additional evidence that helps establish a release from the Sewer Line.  Thus, this opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

which is owned and operated by the City.  It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

7. **Opinion 7:  The City of Cerritos knew or should have known that chlorinated solvents would be discharged into the City's sewer system and that they could be released into the environment through cracks and other defects in that system.**

- The City reviewed and approved Crown Cleaners plans and allowed Crown Cleaners to install and operate a dry cleaning machine at the Property without imposing any requirements relating to PCE discharge to the sewer.

- At the time the City took such action, it was common knowledge among municipal sewer permitting, management and maintenance personnel that dry cleaning operations could result in PCE discharges into the sewer system that could impact groundwater through leakage from cracks and other defects in the sewer system.

a. **Basis for Opinion 7:**

The City exhibited knowledge concerning the management of environmental issues dating back to at least 1988, including the evaluation of soil and groundwater

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

contamination.  In addition, the City was aware of the operations at Crown Cleaners and should therefore have been aware that cleaning solvents were likely to be entering its sewer system.

In 1988, the City of Cerritos Redevelopment Agency managed the removal of the three USTs that had been used by S&J in order to prepare the Property for redevelopment as a shopping center.  The Redevelopment Agency included a Department of Environmental Affairs which managed such issues.  The City retained environmental consultants and worked with the environmental regulatory agency, the Los Angeles County Department of Public Works, to obtain permits, assess the extent of soil contamination around the tanks, develop a plan for soil remediation, perform groundwater monitoring, manage the disposal of contaminated soil from the site, and mitigate the contamination to the satisfaction of the regulator.

The Property was redeveloped in 1988-1989 in accordance with requirements and permits from the City.  An occupancy permit was issued for Crown Cleaners by the LACFD in December 1989.

Although no Industrial Waste Discharge permit was issued, permitting for the floor drain at Crown Cleaners indicates that the City was aware of the plumbing connection between Crown Cleaners and the Sewer Line.  A building permit for a floor sink was issued by Cerritos (through the County of Los Angeles, Department of Public Works) in November 1989.

Furthermore, by 1989, it was common knowledge among municipal sewer permitting, management and maintenance personnel that dry cleaning operations posed a significant risk to groundwater, that many dry cleaning machines were designed to discharge PCE-impacted water and even pure PCE into the sewer system which could escape into soil and groundwater from cracks and other defects in sewer lines, and that this was the primary pathway by which PCE was being released into the environment.

Documents obtained from LACSD identified numerous commercial and

860196

industrial dischargers to the sewer in Cerritos.  This information included the results of site inspections, wastewater analysis, and self-monitoring reports and was provided to the City on a regular basis.  These reports also included Notices of Violation for non-compliance.  Chlorinated solvents were found in the wastewater in samples collected in Cerritos as early as 1990.  Therefore, the City had knowledge or constructive knowledge that hazardous materials were being discharged to the sewer.  Annual LACSD inspection records from 1995 to 2000 noted that there was intermittent discharge to the sewer from Crown Cleaners.

LACSD routinely detects VOCs in the influent at each of the treatment plants that receive wastewater from Cerritos. This is public information that the City had access to and therefore should have been aware of.

**b.      Relevance of Opinion 7:**

This opinion is relevant to the case because it demonstrates that the City failed to exercise due care with respect to discharges into its sewer system that could be released into the environment through cracks and other defects in its sewer lines, thereby defeating any claim that the City has a third party defense to liability under CERCLA.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

**8.      Opinion 8**

The response that was conducted at Crown Cleaners by Bixby Lincoln, the remedial investigation of groundwater contamination, and the development of a feasibility study and RAP with respect to that contamination have been performed under the oversight and direction of the LACFD and, after groundwater

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

contamination was discovered, the RWQCB and have been conducted in a manner that is consistent with that agency's requirements.  Those actions have been and are necessary to protect public health and the environment and are being performed in a manner that substantially complies with the NCP.

### a.      Basis for Opinion 8:

Following implementation of the response to soil contamination at Crown Cleaners, LACFD referred the case to the RWQCB for direction and oversight of the response with respect to the related groundwater contamination.  The LACFD also issued case closure for the soil contamination based on a comparison to EPA Region IX Preliminary Remediation Goals (PRGs) and the absence of any threat to public health and safety.

Based on the low concentrations of PCE in the groundwater at and downgradient from Crown Cleaners in 2000, it is likely that the RWQCB would have granted closure with respect to the Property if there had been no release from the South Street Sewer Line. This closure would have been issued because SVE had been successful and concentrations of PCE in soil and soil vapor had been significantly reduced.  Concentrations of PCE in groundwater beneath and downgradient of Crown Cleaners were also low and had been indirectly further reduced as a result of the SVE system's operation.  The remaining concentrations of PCE in soil were viewed as not likely to negatively impact groundwater as demonstrated by the application of the VOC attenuation factor method calculations in the 1996 RWQCB Remediation Guidance for Petroleum & VOC Impacted Sites.  The remaining concentrations in groundwater were within one order of magnitude of the Maximum Contaminant Level (MCL).

Since referral of the contamination in groundwater at the Property to the RWQCB, that agency has provided review, direction and oversight of all investigation activities at the Property and will be the agency to approve the feasibility study and final RAP for addressing that contamination.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Currently the project is within the detailed analysis phase, the last phase of the CERCLA Remedial Investigation/Feasibility Study (RI/FS) process.  During detailed analysis, alternatives are evaluated in detail with respect to nine evaluation criteria developed to address the statutory requirements and preferences of CERCLA.  The nine criteria include:

- Overall protection of human health and the environment;
- Compliance with applicable or relevant and appropriate requirements (ARARs);
- Long-term effectiveness and permanence;
- Reduction of toxicity, mobility, or volume;
- Short-term effectiveness;
- Implementability;
- Cost;
- State acceptance; and
- Community acceptance.

The alternatives are analyzed individually against each criterion and then compared against one another to determine their respective strengths and weaknesses and to identify the key trade-offs that must be balanced for the site.  The results of the detailed analysis are summarized so that an appropriate remedy consistent with CERCLA can be selected.

Community relations activities serve to keep communities informed of the activities at the site and help the lead agency anticipate and respond to community concerns.  CERCLA requires publication of a notice of the proposed remedial action in a local newspaper of general circulation and a "reasonable opportunity" for the public to comment on the proposed plan.  Community relations are expected to include the following items:

- Preparation of a Community Relations Plan (CRP) to document the community relations history and the issues of community concern.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

- Meeting with elected officials and the City to help develop an understanding of local dynamics and gather information regarding the level of outreach desired by the elected officials and the City.
- An introductory mailing consisting of a one-page letter/fact sheet will be mailed to approximately 110 homes and businesses in the immediate vicinity of the Property to introduce the issue in a general manner, the need for remediation, the development and screening of remedial alternatives, and provide the current status of addressing the issue.
- An open house will be held for local stakeholders to learn more about the condition of the impacts. Considerations for developing remedial alternatives will be presented, briefings will be provided for local officials and concerned citizens regarding alternatives under consideration, and a small group meeting may be held for citizens involved with the site.

A draft CRP has been prepared and will be finalized in the near future. Responses from the community will provide insight into community interest and opinion. Input from the community through the above process will be considered and used in the final selection of the remedial technology to be applied to the site. An Administrative Record will be maintained throughout the community relations process.

### b.     Relevance of Opinion 8:

This opinion is relevant to the case because it supports MGP's contention that the response costs that have been incurred by Bixby and MGP at the Property are both necessary and in substantial compliance with the NCP, thereby fulfilling one of the elements of its CERCLA claim.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the

contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination given its voluntary cleanup efforts.

### 9.    Opinion 9

Based on a review and evaluation of invoices associated with the response action that has been and is continuing to be conducted at the Property, response costs incurred to date, including agency oversight, are approximately $1,236,142.

### a.    Basis for Opinion 9:

Past response costs have been incurred for site characterization activities, SVE at Crown Cleaners, groundwater monitoring, preparation of remedial action plans and agency oversight. This work was performed by EST from 1998 to 2007, by Geosyntec from 2007 to 2011 and by TOR from 2011 to the present.

Regulatory agency oversight was provided initially by LACFD and since 2000 by the RWQCB. The RWQCB Site Cleanup Program is designed so that reasonable expenses incurred by the RWQCB in overseeing water quality matters can be recovered from the responsible party.

Waterstone reviewed records of invoices for past work performed by Geosyntec and TOR. Because records of EST's invoices could not be located, an estimate of EST's costs was prepared based on the scope of work known to have been completed by EST. Invoices for agency oversight were also not available. An estimate based on typical agency oversight costs incurred for similar projects was therefore prepared.

To date, three technical proposals have been prepared for the remediation of groundwater. The most recent proposal was prepared by TOR in April 2012 and proposed ozone sparging of the saturated zone to reduce the levels of chlorinated solvents to acceptable levels. This technology was eliminated from consideration after bench testing found that ozone sparging resulted in the formation of hexavalent chromium, a known hazardous substance. These proposals are considered part of the CERCLA Feasibility Study (FS) process which includes the identification and

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

screening of technologies, development and screening of alternatives and detailed analysis of alternatives. The process is ongoing.

The past response costs through October 2013, including agency oversight, have been calculated to be $1,236,142.

### b.   Relevance of Opinion 9:

This opinion is relevant to the case because it supports MGP's contention that recoverable response costs have been incurred with respect to the contamination that is impacting the Property, thereby fulfilling one of the elements of its CERCLA claim.  This opinion is relevant to the case because it supports MGP's contention that the response costs that have been incurred by Bixby and MGP at the Property are both necessary and in substantial compliance with the NCP, thereby fulfilling one of the elements of its CERCLA claim.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination given its voluntary cleanup efforts.

### 10.   Opinion 10

Based on the site characterization activities that have been conducted at the Property and the types and quantities of contaminants that are present, it appears that electrical resistive heating will turn out to be the most appropriate remedial technology.  Future response costs associated with implementation of this technology, including additional site characterization, the completion of the RAP, implementation of NCP requirements (including community relations), agency oversight, and groundwater/soil vapor monitoring, are estimated to be approximately $9,618,181.

### a.   Basis for Opinion 10:

Future response costs will be incurred for completion of the feasibility study,

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

RAP preparation, groundwater remediation, groundwater monitoring, site restoration and agency oversight.

The RWQCB has required the submittal of a RAP to outline methods for mitigation of the concentrations of chlorinated solvents and other site contaminants in the groundwater.  Technologies considered to date have included:

- No Action;
- Surface Cap;
- Soil Excavation, Transport & Disposal;
- Groundwater Pump and Treat;
- Dual Phase Soil Vapor Extraction;
- Groundwater Ozone/Air Sparging;
- Biological Treatment;
- Electrical Resistive Heating (ERH).

Currently, TOR is preparing a RAP which will recommend remediation of the groundwater using ERH. ERH is an in situ technology which effectively vaporizes the VOCs in both the unsaturated and saturated intervals which are then removed by a vapor recovery process.  Electrodes and vapor recovery wells are co-located in a grid pattern within the targeted treatment area.  Vapors, steam and non-aqueous phase liquids (NAPL) are recovered to the surface under vacuum.  The multiple phases are treated at the surface using standard treatment techniques such as carbon adsorption. The system is designed for 99% destruction of VOCs within the treatment area.

Waterstone was provided with an estimate for groundwater remediation using ERH that was prepared by TRS, an ERH vendor/contractor identified by TOR. In addition, Waterstone was provided with an estimate prepared by TOR for other tasks such as groundwater monitoring, reporting and agency interaction. The estimated cost to complete the groundwater remediation at the Property using ERH is $4,645,379. This cost estimate assumes the following:

- Treatment area of 20,000 square feet.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

- Treatment depth range of 10-45 feet bgs.
- Treatment volume of 25,900 cubic yards.
- Vapor treatment of chlorinated solvents via carbon adsorption.
- System operation duration of six (6) months.
- Treatment of plume perimeter/residual concentrations with in situ chemical oxidation.

It is important to note that the above estimate is based on the current size and location of the chlorinated solvent plume on the Property and does not take into account the presence of 1,4- dioxane.  Based on the physical properties of 1,4-dioxane it is reasonable to assume that the 1,4- dioxane plume is larger and has traveled further downgradient than the chlorinated groundwater plume.  Theoretically, the size of the 1,4-dioxane plume is up to twice as long and six times larger than the associated chlorinated solvent plume.  For the purposes of accounting for costs to address the 1,4-dioxane groundwater plume, it is estimated that the area requiring treatment will be twice as large as the area of chlorinated solvents.

For this reason Waterstone has estimated the cost to remediate both the chlorinated and 1,4-dioxane plumes to be $9,290,758. This cost estimate is based on the following assumptions:

- Treatment area of 40,000 square feet.
- Treatment depth range of 10-45 feet bgs.
- Treatment volume of 51,800 cubic yards.
- Vapor treatment by carbon adsorption.
- System operation duration of six (6) months.

An estimated $202,423 in additional costs will be incurred for five years of groundwater and soil vapor monitoring, reporting and agency interaction. Groundwater monitoring will be conducted semi-annually starting in 2014. This testing will support RAP development, provide a baseline prior to remediation, and demonstrate that remedial activities have achieved their goal.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Agency oversight costs were estimated based on typical oversight costs incurred for similar projects.  Future estimated costs for five years of agency oversight are estimated to be approximately $125,000.

In total, when accounting for 1,4-dioxane, and including agency oversight costs, the future response costs are estimated to be $9,618,181.

### b.    Relevance of Opinion 10:

This opinion is relevant to the case because it supports MGP's contention that declaratory relief is necessary and appropriate due to the existence of future response costs that will be incurred in addressing the release of hazardous substances that has occurred at the Property.  This opinion is relevant to the case because it supports MGP's contention that the response costs that have been incurred by Bixby and MGP at the Property are both necessary and in substantial compliance with the NCP, thereby fulfilling one of the elements of its CERCLA claim.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination given its voluntary cleanup efforts.

### B.    Opinions Set Forth in Dr. Dagdigian's Rebuttal Report

The following opinions are set forth in Mr. Dagdigan's rebuttal report, which is attached hereto as **Trial Exhibit 130.**

#### 1.    Rebuttal Opinion 1:  Groundwater testing results for 1,4-dioxane confirm that the TCE and PCE releases were from separate sources and were not the result of naturally occurring reductive dechlorination of PCE used at the on-site dry cleaners or TCE contamination of PCE used for dry

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**cleaning.**

      **a.**      **Basis for Rebuttal Opinion 1:**

     In addition to the VOC groundwater testing results discussed in Dr. Dagdigian's Expert Report, more recent laboratory results provided for groundwater samples collected by TOR Environmental in August 2013 show that 1,4-dioxane was present above laboratory reporting limits in 14 of 54 groundwater samples.

     In many samples, although 1,4-dioxane is thought to be present, it was not detected above laboratory reporting limits due to dilutions required in order to measure elevated concentrations of PCE and TCE. In samples with high PCE and TCE concentrations, the reporting limits for 1,4-dioxane were elevated to between 50 µg/L and 5,000 µg/L depending on the respective PCE and TCE levels. These elevated reporting limits would mask the presence of any 1,4-dioxane in the samples.

     In groundwater samples where 1,4-dioxane was detected above the laboratory reporting limits, concentrations of 1,4-dioxane ranged from 87 to 7,100 µg/L. The maximum concentration was detected within South Street (CPT-53) at a depth of 28-32 feet bgs.

     The significance of the 1,4-dioxane detections is that they confirm that the TCE and PCE releases are from separate sources. PCE used at dry-cleaning establishments is not known to contain 1,4-dioxane; however, 1,4-dioxane is known to be used as a stabilizer for TCE.  Thus the presence of 1,4-dioxane conclusively demonstrates that the presence of TCE in the groundwater is not the result of naturally occurring reductive dechlorination of PCE used at the on-site dry cleaners or TCE contamination of PCE used for on-site dry-cleaning.

      **b.**      **Relevance of Rebuttal Opinion 1:**

     This opinion is relevant to the case because it dispels any contention by the City that the TCE contamination did not result from a release from its Sewer Line but rather from on-site conditions.  This opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

operated by the City, and that there has been a release at the Property which is owned and operated by the City.  It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

**2.**     <u>**Rebuttal Opinion 2:  It is unlikely that PCE or TCE were used as grain fumigants at Pioneer Mills/Yesterlaid Farms and have contributed to the groundwater contamination underlying the Property.**</u>

       **a.**     <u>**Basis for Rebuttal Opinion 2:**</u>

Pioneer Mills/Yesterlaid Farms is located upgradient of the Sewer Line and north of the borings  that contain significantly lower concentrations of PCE and TCE than the borings further south and immediately adjacent to the Sewer Line.  There are no documents available from local agencies, including the Los Angeles County Department of Public Works, indicating that TCE or PCE were ever used or stored at Pioneer Mills/Yesterlaid Farms for use as a grain fumigant or for any other purpose. Similar documents were available for other businesses in the area, including Alco Chemical and Artesia Implement, indicating that, if such chemicals were being used or stored at the facility, the County would have noted that in their records.

The Los Angeles County Department of Sanitation maintains records for Industrial Waste Discharge by Pioneer Mills/Yesterlaid Farms. None of these records indicate the disposal of solvents. Only detergents and egg shells were noted in these

records.

Although PCE and TCE have been identified as potential grain fumigants, the most common grain fumigant from the 1940s to the 1960s, the period during which Pioneer Mills/Yesterlaid Farms was operating, was a mixture of carbon tetrachloride and carbon disulfide.  Neither carbon tetrachloride nor carbon disulfide have been detected during the recent groundwater monitoring and grab groundwater sampling events conducted down-gradient of that property by Geosyntec or TOR.

Furthermore, there is no evidence that grain was ever stored at Pioneer Mills/Yesterlaid Farms.

### b.   <u>Relevance of Rebuttal Opinion 2:</u>

This opinion is relevant to the case because it dispels the City's unsupported contention that Pioneer Mills/Yesterlaid Farms, rather than the Sewer Line, is a possible source of the groundwater contamination that has impacted the Property. Although the location of the contamination plume is itself sufficient to establish a release from the Sewer Line, the evidence regarding the implausibility of other potential sources supplies additional evidence that helps establish a release from the Sewer Line.  Thus, this opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City.  It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1    associated with such contamination.

2        **3.    Rebuttal Opinion 3:  The historical release of PCE to soil at**

3            **Crown Cleaners or leakage from on-site sewer laterals did**

4            **not contribute to the upgradient plume of PCE groundwater**

5            **contamination that underlies the Property.**

6        **a.    Basis for Rebuttal Opinion 3:**

7        The groundwater data are not consistent with the City's contention that

8    historical releases of PCE (but not TCE) from Crown Cleaners into the underlying

9    soil, upgradient migration of PCE along the lateral trenches or on top of low

10   permeable layers, or leakage from the on-site laterals have contributed to the

11   upgradient plume of PCE groundwater contamination impacting the Property.  If PCE

12   from Crown Cleaners had either leaked from the onsite sewer laterals or traveled

13   along the trench backfill, then much higher levels of PCE would be found in the

14   shallow groundwater (Zone 1) underlying the Property. However, the highest

15   concentrations in Zone 1 were found immediately beneath the Sewer Line at CPT-46,

16   confirming that the Sewer Line is the source. The concentrations at CPT-46 are more

17   than an order of magnitude greater than the levels found anywhere else on the

18   Property. This confirms that, starting at the Sewer Line, the contaminants migrated

19   both vertically downward and horizontally downgradient in the groundwater

20   underneath the Property. In addition, the contaminants traveled a short distance

21   upgradient to the north to HP-23/23A.

22       Extensive testing was performed on the Property near and immediately beneath

23   the onsite sewer laterals. If the PCE in groundwater had originated from the sewer

24   laterals or the lateral trench backfill, then a wide area of elevated PCE concentrations

25   would have been found throughout Zone 1 beneath the onsite laterals, but it was not.

26   Furthermore, the maximum levels found within the entire study area were adjacent to

27   and immediately downgradient of the Sewer Line.

28       The City's contentions are further rebutted by the fact that the onsite sewer

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

laterals were installed more recently, in approximately 1989, and are constructed of superior materials that are much less prone to damage and leakage than the Sewer Line, which was constructed with VCP and installed as early as the 1940s.

As to the contention that DNAPL (pure PCE) may have migrated horizontally upgradient, the concentrations in groundwater in the vicinity of Crown Cleaners are not such that the migration behavior of DNAPL would be exhibited. Typically, the presence of DNAPL is indicated when dissolved concentrations of PCE are greater than 1% of its solubility in water. However, the maximum concentrations in the vicinity of Crown Cleaners are approximately 200 g/L, which is only one tenth of one percent of the solubility of PCE in water.

### b.   Relevance of Rebuttal Opinion 3:

This opinion is relevant to the case because it dispels the City's speculative contention that at least some of the PCE contamination in the groundwater underlying the Property came from an on-site release, rather than from a release from the City's Sewer Line. Although the location of the contamination plume is itself sufficient to establish a release from the Sewer Line, the evidence regarding the implausibility of other potential sources supplies additional evidence that helps establish a release from the Sewer Line. Thus, this opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City. It is worth noting that the City is liable for any release at the Property, regardless of whether it came from the laterals (a proposition for which there is no evidentiary basis). It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property. This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys'

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

**4.    Rebuttal Opinion 4: Given the low levels of total trihalomethanes (THMs) in the City's drinking water supply, it is not possible to use the total level of THMs in groundwater as a marker for releases from the sewer system.**

**a.    Basis for Rebuttal Opinion 4:**

THMs are a group of organic chemicals formed in water when chlorine reacts with natural organic matter (such as humic acids from decaying vegetation). Humic acids are present in all natural water used as sources of drinking water. THMs are not a single chemical but a class of compounds that includes:

- Chloroform (CHCl3)
- Bromoform (CHBr3)
- Dichlorobromomethane (CHCl2Br)
- Dibromochloromethane (CHClBr2).

A U.S. Environmental Protection Agency (EPA) survey discovered that THMs are present in virtually all chlorinated water supplies. Many years ago, EPA required towns and cities to reduce total THM levels in potable water. The California Code of Regulations currently specifies that the primary MCL (drinking water standard) for total THMs (the concentration of the above four chemicals added together) of 80 ppb shall not be exceeded.

There is data showing that the City's drinking water has a maximum of approximately 20 µg/L (ppb) total THMs. No data has been provided showing the levels of  THMs that are present in the sewer water leaving Lincoln Station, which should be lower than the levels present in drinking water.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

860196

The City falsely asserts that, since there have been no confirmed detections of THMs in samples of the groundwater collected beneath Lincoln Station, the sewer could not have leaked. The concept of using THMs as marker species for leaking drinking water and sewer water pipelines has been investigated. In the paper "Marker Species for Identifying Urban Groundwater Recharge Sources: a Review in Case Study in Nottingham, UK," investigators researched using chlorination byproducts as marker chemicals to identify sources of releases to groundwater.

In this study, the investigators discuss total THM values in a similar previously reported case study performed in Coventry, UK.   In this previous study, the mean concentration of total THMs in drinking water was 60 μg/L and the corresponding level of total THMs in sewer water was 18 μg/L.  Additionally, low levels of total THMs (2.1 μg/L) were found in the groundwater where the source of contamination was determined to be leaking drinking water mains. In the subject study, investigators determine that, in Nottingham, UK, the mean concentration of total THMs is only 21 μg/L and that the corresponding concentration of total THMs in sewer water ranges from 0 to 6 μg/L.  These total THM values are approximately one third of those reported in the Coventry, UK investigation. Based on the assumption that dilution factors are similar in the two venues, the investigators predicted that total THMs would not be detectable in the Nottingham groundwater.  The results of groundwater sampling verified the investigators' predictions; total THMs were below detection or quantifiable limits. Investigators state that this is not surprising given the low concentrations of total THMs in the drinking water.

Total THM levels for water in the Cerritos distribution system are summarized for a number of recent years in the table below.

Total THMs (micrograms per liter)

| Year | Average | Range |
|------|---------|-------|
| 2008 | 6.1 | 1.7 to 13 |

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

| 2009 | 7.1 | 1.5 to 18.5 |
|------|-----|-------------|
| 2010 | 8.7 | 3.4 to 19 |
| 2011 | 8.1 | 2.7 to 18 |
| 2012 | 19 | ND to 20 |

Based on the data presented in the table, the highest average value for total THMs was 19 µg/L in 2012 and the highest value detected for total THMs was 20 µg/L in 2012. These values are similar but slightly lower than those reported by investigators studying total THMs in the water supply for Nottingham, UK. Thus, it is highly likely that total THMs in the sewer water are also at comparable (but lower) values to those reported for the Nottingham, UK sewer system (i.e. ND to 6 µg/L).

Given the results of the investigation presented by investigators searching for marker chemicals in groundwater in Nottingham, UK, it is clear that the reason no THMs were found in the groundwater beneath Lincoln Station is because both the drinking water and sewer water have extremely low concentrations of THMs. When water leaking from the sewer pipeline is combined with groundwater, the resulting diluted concentrations of THMs would be far below detectable limits.

An additional rationale provided by the City for the opinion that the VOCs impacting groundwater underlying the Property are not from a leak in the Sewer Line is that the redox conditions of the groundwater beneath Lincoln Station are not characteristic of groundwater impacted by sewage. The volumes of VOCs released from the Sewer Line were expectedly relatively small, and therefore would have contained very little, if any, actual sewage. Therefore, the releases would not have resulted in measureable changes to the redox conditions of the surrounding groundwater. Furthermore, the native soil matrix around the sewer pipe forms an effective natural filter to the movement of sewage and organic matter such that, even with a release of some sewage, it would not have traveled a significant distance from the sewer pipe and would be quickly diluted by the surrounding groundwater. Given the above, the releases from the Sewer Line did not contain the volumes of sewage

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

39

1    that would be necessary to effect a measureable change to the redox conditions in the

2    groundwater.

3                    **b.**     **Relevance of Rebuttal Opinion 4:**

4         This opinion is relevant to the case because it dispels the City's contention that

5    conditions in the groundwater underlying the Property are inconsistent with the Sewer

6    Line being the source of the PCE contamination.  This opinion is also relevant in that

7    it helps establish that there was a release of hazardous substances from the Sewer

8    Line owned and operated by the City, and that there has been a release at the Property

9    which is owned and operated by the City.  It is also relevant to help show that the City

10   cannot establish the third party defense under CERCLA; specifically, the City cannot

11   establish that it used due care given that its Sewer Line contributed and caused the

12   contamination at issue and/or given its management of the Property.  This opinion is

13   also relevant to a number of MGP's affirmative defenses, including unclean hands,

14   waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys'

15   fees improper, compliance with all laws, and bona fide prospective purchase.   It is

16   relevant to these affirmative defenses because, among other things, it helps establish

17   that the City's conduct caused the contamination at issue and that MGP should not

18   bear any costs or liabilities associated with such contamination.

19            **5.**     **Rebuttal Opinion 5:  It is reasonable and most likely that the**

20                      **PCE, TCE and 1,4-dioxane were released from the Sewer**

21                      **Line at the first location where there were defects, in the**

22                      **vicinity of the three circumferential cracks and other defects**

23                      **just west of Manhole 2.**

24                    **a.**     **Basis for Rebuttal Opinion 5:**

25        Based on the distribution of the chemicals found in groundwater, it is clear that

26   the PCE and TCE leaked from the sewer line at the first location where there were

27   cracks and other defects (e.g. failed joints) related to the cracks in the sewer pipe. Not

28   only were there several circumferential cracks identified during the inspection of this

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

---

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

portion of the sewer line, there are additional cracks visible, including longitudinal cracks, in the video images which were not reported by Empire Pipe Cleaning and Equipment, Inc.

It is unknown under what exact circumstances the contaminants leaked from the Sewer Line. For example, the time of day and flow rates at the times of the releases are unknown.  The trapping of TCE and PCE behind blockages or build ups in the Sewer Line or an inadequate slope to the line to assure self cleaning could significantly increase the residence time of the hazardous chemicals within the sewer pipe and, when combined with their higher densities relative to water, would allow for the chemicals to eventually move along the bottom of and preferentially leak from the pipe. In addition, the entrainment of TCE and PCE within grease buildups, typically found in sewer pipes, would also increase the residence time of these chemicals in the Sewer Line and lead to future releases of TCE and PCE within and from the sewer pipe.

Once released into the soil underlying the Sewer Line, portions of the hazardous chemicals could then take long periods of time, up to decades, for portions of the TCE and PCE to work its way through underlying clay or other impervious or semi-impervious obstacles (e.g. rocks), enter the groundwater and then move downgradient underneath the Property. In fact, the available test results indicate that the highest concentrations of TCE and PCE are still present underneath South Street, where they remain poised, under the right circumstances, to be released to migrate beneath the Lincoln Station Shopping Center.

The portion of the sewer line where the leaks occurred only serviced discharges from the former S&J and Lincoln Station, including Crown Cleaners. However, downstream of this area and of Manhole No. 3 there are several other inlets to the sewer which would have affected the flow and changed the makeup of the water flowing through that portion of the pipe.

There has not been any groundwater testing performed to the west of the three

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

circumferential cracks in the Sewer Line or at facilities in the immediate vicinity of the Sewer Line west of Manhole No. 3 which would confirm the presence or absence of PCE and TCE. Regardless, the available groundwater data in the immediate area of the three circumferential cracks directly correlates with a release from that portion of the sewer pipe, which is shortly downstream of Manhole No. 2.

No PCE or TCE was detected in groundwater at Fire Station #30 during testing performed in 2002 and 2003. This facility is located approximately 300 feet downgradient of the portion of the Sewer Line that is west of Manhole No. 3 and the results or lack thereof are not meaningful for evaluation of a possible release between Manhole No. 2 and No. 3. The absence of solvents in groundwater at Fire Station #30, if true, does not preclude the occurrence of leakage from the portion of the Sewer Line near Manhole No. 2.

### b.    Relevance of Opinion 5:

This opinion is relevant because it dispels the City's contention that the a release from the Sewer Line could not have been the source of the groundwater contamination impacting the Property because more widespread contamination would have to have occurred for that to be the case. This opinion is relevant to the case because it dispels any contention by the City that the TCE contamination did not result from a release from its Sewer Line but rather from on-site conditions. This opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City. It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property. This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

### 6.   Rebuttal Opinion 6:  Relatively small volumes of PCE and TCE is all that would have been required to form the plumes of contamination impacting groundwater underneath the Property, small amounts of the chemicals in wastewater that were discharged to the Sewer Line over extended periods of time.

#### a.   Basis for Rebuttal Opinion 6:

It is not necessary for there to have been a large release of TCE or PCE to account for the plumes observed at the Property. Waterstone  performed calculations based on the concentrations and sizes of the plumes and determined that the plume as observed could have been caused by releases of as little as 5.2 gallons of TCE and 2.5 gallons of PCE. The following assumptions were used in this calculation:

- Average concentration of maximum and minimum concentration within each isoconcentration contour interval in each of the water bearing zones
- Height limited to groundwater flow zone intervals
- Soil Porosity = 0.3
- Density of TCE: 1.46 grams per milliliter
- Density of PCE: 1.62 grams per milliliter.

#### b.   Relevance of Rebuttal Opinion:

This opinion is relevant to the case because it dispels the City's contention that massive amounts of wastewater containing hazardous substances would have needed to leak out of the Sewer Line in order to create the contamination in groundwater that underlies the Property, amounts of wastewater that are inconsistent with the degree of defects in the Sewer Line that have been identified.  This opinion is relevant to the

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

case because it dispels any contention by the City that the TCE contamination did not result from a release from its Sewer Line but rather from on-site conditions.  This opinion is also relevant in that it helps establish that there was a release of hazardous substances from the Sewer Line owned and operated by the City, and that there has been a release at the Property which is owned and operated by the City.  It is also relevant to help show that the City cannot establish the third party defense under CERCLA; specifically, the City cannot establish that it used due care given that its Sewer Line contributed and caused the contamination at issue and/or given its management of the Property.  This opinion is also relevant to a number of MGP's affirmative defenses, including unclean hands, waiver, third party defense, equitable allocation, set off, unjust enrichment, attorneys' fees improper, compliance with all laws, and bona fide prospective purchase.   It is relevant to these affirmative defenses because, among other things, it helps establish that the City's conduct caused the contamination at issue and that MGP should not bear any costs or liabilities associated with such contamination.

## II.     Documents Relied on by Mr. Dagdigian

In forming the opinions set forth above, Mr. Dagdigian relied on the following documents:

- **13** – Post-Remediation Soil Gas Assessment Report, prepared by Geosyntec, dated July 27, 2007.
- **14** – Letter from E. Jimison and N. Bice to A. Castaneda, dated October 9, 2007, Re: Work Plan for Additional Groundwater Investigation and Quarterly Groundwater Monitoring.
- **16** – Draft Remedial Action Plan, prepared by Geosyntec, dated April 16, 2010.
- **17** – Letter from N. Bice to A. Castaneda, dated February 28, 2011, with attached Remedial Action Plan prepared by Geosyntec, dated February 23, 2011.
- **36** – Portion of Sewer System Map, C-134, dated December 7, 1978.

- **59 –** Portions of Sewer System Map, C-134, dated December 7, 1978.

- **63 –** Town of Artesia – Elevation Blueprints of South St. showing grade, undated.

- **64 –** Building Records from Building and Safety Department at Cerritos City Hall, various dates.

- **70 –** Permit to Construct/Operate, Issued by South Coast Air Quality Management District to Crown Cleaners, dated December 27, 1989.

- **71 –** Building Records, Crown Cleaners, various dates.

- **102 –** County Sanitation Districts of Los Angeles County notification dated August 13, 1982 voiding Industrial Wastewater Discharge Permit No. 5112 previously issued to S & J Chevrolet.

- **104 –** City of Cerritos Redevelopment Agency correspondence dated March 1, 1990 regarding Closure Permit 4589B and attaching remediation reports prepared for City of Cerritos Redevelopment Agency.

- **105 –** County of Los Angeles, Department of Public Works Site Assessment/Remedial Action Plan Closure Certification dated August 13, 1990 ("No Further Action" letter).

- **106 –** Letter from Mike O'Grady of City of Cerritos to Aaron D. Hill of Bixby Land Company dated December 3, 2010.

- **107 –** Letter from Pamela L. Andes of Allen Matkins to Dennis S. Roy of McKenna Long & Aldridge dated January 7, 2011.

- **126 –** Color Figures 1 through 25 from the Expert Report of J. Dagdigian, dated November 18, 2013.

- **130 –** Rebuttal Expert Report of J. Dagdigian, dated December 9, 2013.

- **137 –** Well Permit Applications and Approvals, various dates; Letter from TOR Environmental, Inc. (TOR) re Groundwater Monitoring Well and CPT/Hydropunch Boring Permit Application, dated July 25, 2013.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

860196

- **138** – Borehole cross-sections/depths, of Groundwater Monitoring Wells LS-2 & LS-3, prepared by TOR, dated October 22, 2013.
- **139** – Letter to Dept. of County Engineer, Project Planning & Pollution re Industrial Wastewater Discharge Permit No. 5112, dated September 22, 1976.
- **140** – Technical Approaches to Characterizing and Cleaning Up Automotive Repair Sites Under the Brownfields Initiative, U.S. Environmental Protection Agency (USEPA), dated February 1999.
- **141** – Expert Report of J. Dagdigian (excluding tables), dated November 18, 2013.
- **142** – Letter of No Further Action, and Monitoring Report prepared by Leroy Crandall and Associates, dated July 16, 1990.
- **143** – Site Health and Safety Plan, prepared by TOR, dated December 20, 2012.
- **144** – Uniform hazardous Waste Manifests, Crown Cleaners, various dates.
- **145** – Report prepared by V. Izzo for the Los Angeles Regional Water Quality Control Board, Well Investigation Program entitled, Dry Cleaners – A Major Source of PCE in Groundwater, dated March 27, 1992.
- **146** – Phase I Environmental Assessment Report, prepared by EMG, dated August 13, 1998.
- **147** – Table 1; PCE and TCE Koc Values Reported in Literature, undated.
- **148** – Table 3; Cost Estimate Summary, Site Characterization and Remediation, undated.
- **149** – Invoices from TOR, various dates.
- **153** –Rebuttal Expert Report of Bonneau Dickson dated December 9, 2013.
- **154** – TOR Phase I Environmental Site Assessment Report, dated July 11, 2011.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

- **159 –** Groundwater Remedial Action Plan prepared by TOR Environmental dated April 12, 2012.

- **160 –** California Regional Water Quality Control Board - Los Angeles Region, 2013. Approval of Bench Scale Test Work Plan for Ozone Treatment of Groundwater, Former Crown Cleaners at 11900 South Street Unit 114, Cerritos, California (SCP No. 0921, Site ID No. 204AL00), dated January 7, 2013.

- **164 –** Table 1 – Data from CPT Borings 1-55, Table 2 – Groundwater monitoring well data.

- **168 –** Information re Crown Cleaners from RCRA-SQG, FINDS and HAZNET databases (excerpt of TOR Phase 1 Report).

- **169 –** TOR Environmental Groundwater and Soil Vapor Monitoring Well Systems Installation Work Plan dated December 18, 2013.

- **170 –** Cover Letter Dated 2/4/14 and attached soil boring date for CPT/DP 45 and 54 from TOR Environmental.

- **176 –** Cerritos, California, Municipal Code, Chapter 3.28 Sewer Maintenance Assessment.

- **177 –** Cerritos, California, Municipal Code, Chapter 13.08 Sanitary Sewers.

- **178 –** Cerritos, California, Municipal Code, Chapter 17.24 Dedications, Improvements, and Improvement Plans.

- **179 –** Cerritos, California, Municipal Code, Chapter 22.80 Environmental Performance Standards.

- **180 –** County of Los Angeles Department of Public Works. Various Building Permits issued to 11900 South Street.

- **181 –** Department of Toxic Substances Control. Hazardous Waste Tracking System Disclaimer & Data Limitations Statement.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

860196

- **182 –** Los Angeles County Division of Sanitation – Industrial Waste. 1948. Industrial Waste Disposal Statement, July 6.

- **184 –** Los Angeles County Road Department. 1968. As Built Plans, Misc. Trans. Drain No. 206, Unit IV, Sheet 30 of 45, Dwg. No. 55487.

- **185 –** Current Intelligence Bulletin 2: Trichloroethylene (TCE), Centers for Disease Control and Prevention, Publication 78-127, dated June 6, 1975 (captured from CDC website, January 30, 2014).

- **186 –** Sanitation Districts of Los Angeles County, Letter Re: Notification of Requirements to Obtain Industrial Wastewater Discharge Permit, dated March 16, 1976 .

- **187 –** Sanitation Districts of Los Angeles County,  Letter Re: Industrial Wastewater Discharge Permit No. 5112 – S & J Chevrolet, dated  September 22, 1976.

- **188 –** Relevant portion of the USEPA's Report to Congress entitled, Waste Disposal Practices and Their Effect on Groundwater, Office of Water Supply, Office of Solid Waste Management Programs, EPA-570/9-77-001, dated January 1977.

- **191 –** Perchloroethylene Dry Cleaners – Background Information for Proposed Standards, USEPA, August 1980.

- **192 –** Vestige of Area's Past: Cerritos Egg Plant Falls to Progress, Steven R. Churm, Los Angeles Times, May 4, 1986 (captured from Los Angeles Times website on January 30, 2014).

- **194 –** Cover letter from LeRoy Crandall and Associates to City of Cerritos Redevelopment Agency for Report of Contamination Remediation – Excavation of Contaminated Soils at 11900 South Street, dated August 22, 1988.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- **195 –** Underground Storage Tank Removal in Cerritos, prepared by Strata Technologies Inc., for the City of Cerritos Redevelopment Agency, dated July 1988.

- **196 –** Letter from Petroleum Waste Inc. to City of Cerritos Redevelopment Agency, Re: Soil Contaminated with Gasoline, dated September 8, 1988.

- **200 –** Letter from County of Los Angeles Department of Public Works to City of Cerritos Redevelopment Agency, Re: Hazardous Materials Underground Storage Site Assessment/Remedial Action Plan Closure Certification, dated August 13, 1990.

- **201 –** Groundwater Monitoring and Well Installation and Sampling Report, prepared by LeRoy Crandall and Associates,  dated August 22, 1990.

- **203 –** Pollution of Groundwater in the Coventry Region (UK) by Chlorinated Hydrocarbon Solvents; Journal of Hydrology, M. W. Burston, M. M. Noazari, P. K. Bishop, D. N. Learner, Volume 149, PP 137 – 161, 1993.

- **204 –** DNAPL Site Characterization Fact Sheet, Publication 9355.4-16FS, EPA/540/F-94/049, PB94-963317, USEPA, September 1994.

- **205 –** Perchloroethylene Dry Cleaning Facility – General Recommended Operations and Maintenance Practices for Dry Cleaning Equipment, USEPA, October 1994.

- **206 –** The Story of Cerritos, Marilyn Cenovich, (Cerritos Library), 1995.

- **207 –** Curriculum for the Environmental Training Program for Perchloroethylene Dry Cleaning Operations, California Air Resources Board, April 1996.

- **209 –** Site Assessment Report, prepared by Environmental Support Technologies, Inc. (EST), dated January 15, 1998.

- **215 –** Remediation Progress Report No. 1, prepared by EST, dated September 24, 1998.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

- **216 –** Barrett, Mike H., Hiscock, Kevin M., Pedley, Stephen, Learner, David N., Tellam, John H., French, Mike J.; Marker Species for Identifying Urban Groundwater Recharge Sources: a Review in Case Study in Nottingham, UK; Water Resources, Volume 33, Number 14, PP. 3083 – 3097, 1999.

- **221 –** Letter from K. Thompson (EST) to L. Olsen (Bixby) re Regulatory Agency Involvement and Request for Site Closure, dated July 14, 1999.

- **224 –** Revised Soil Assessment Work Plan, prepared by EST, dated October 28, 1999 .

- **225 –** Site Assessment Report (EST), dated December 10, 1999.

- **226 –** Letter from T. Klinger (CLAFD) to R. Chou, Re: LARWQCB Lead Agency Status, dated February 9, 2000.

- **227 –** Letter from T. Klinger (CLAFD) to L. Olsen, Re: Site Assessment Report, dated February 9, 2000.

- **229 –** Letter from D. Dickerson (RWQCB) to L. Olsen (Bixby), Re: Spills, Leaks, Investigations and Cleanups (SLIC) Oversight Cost Reimbursement Account, dated February 28, 2000.

- **230 –** Letter from S. Hariri (RWQCB) to L. Olsen (Bixby), Re: Site Assessment Report, Crown Cleaners, dated April 28, 2000.

- **231 –** Age Dating of a Chlorinated Solvent Plume in Groundwater, Gil Oudijk & Lauren M. Schmitt, May 2000.

- **232 –** Site Assessment Workplan, prepared by EST, dated June 6, 2000.

- **233 –** Revised Site Assessment Workplan, prepared by EST, dated July 17, 2000.

- **234 –** Site Assessment Report, prepared by EST, dated July 24, 2000.

- **236 –** Letter from S. Hariri (RWQCB) to D. Stanley (Bixby), Re: Site Assessment Report, dated August 14, 2000.

860196

- **237 –** Workplan for Additional Groundwater Assessment and Monitoring Well Installation, prepared by EST, dated September 11, 2000.
- **238 –** Letter from S. Hariri (RWQCB) to D. Stanley (Bixby), Re: Workplan for Additional Groundwater Assessment and Monitoring Well Installation, dated October 23, 2000.
- **240 –** Groundwater Assessment Report, prepared by EST, dated December 15, 2000.
- **241 –** Letter from M. Tye (EST) to S. Hariri (RWQCB), Re: Addendum to Groundwater Assessment Report, Former Crown Cleaners Site, prepared by EST, dated January 5, 2001.
- **244 –** Groundwater Monitoring Report, prepared by EST, dated March 23, 2001.
- **245 –** Letter from M. Tye (EST) to S. Hariri (RWQCB), Re: Work Plan for Additional Site Assessment, with report, dated April 24, 2001.
- **249 –** Letter from D. Dickerson to M. Bixby, Re: Annual Estimation Letter for Spills, Leaks, Investigations, and Cleanups Cost Recovery Program, dated June 29, 2001.
- **250 –** Site Assessment Report (RWQCB SUC No. 921), prepared by EST, dated July 5, 2001.
- **251 –** Letter from K. Thomson (EST) to S. Hariri (RWQCB), Remedial Action Plan, prepared by EST, dated July 12, 2001.
- **252 –** Workplan for Monitoring Well Installation, prepared by EST, dated September 18, 2001.
- **253 –** Letter from A. Siddiqui (RWQCB) to Mark Bixby re Review Work Plan for Monitoring Well Installation, dated September 27, 2001.
- **254 –** Groundwater Assessment Report, prepared by EST, dated October 31, 2001.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

- **255** – Former U.S. Department of Agriculture Grain Bin Project, USEPA, Region 7, J.J. Field, 2002.

- **256** – Note 36, California Geomorphic Provinces, California Geological Survey, 2002.

- **257** – Letter from A. Siddiqui (RWQCB) to M. Bixby, cc EST re Review of Groundwater Assessment Report, dated January 2, 2002.

- **258** – Groundwater Monitoring Report, prepared by EST, dated February 20, 2002.

- **259** – 1,4-dioxane – A Little Known Compound, Environmental Science & Engineering, D. Grant Walsom and Bruce Tunnicliffe, dated May 2002.

- **260** – Groundwater Monitoring Report, prepared by EST, dated May 20, 2002.

- **261** – Groundwater Monitoring Report (Q3), prepared by EST, dated August 12, 2002.

- **262** – Groundwater Monitoring Report (Q4), prepared by EST, dated November 15, 2002.

- **263** – Instruction for Installation, Machine Operation, Machine Maintenance, Renzacci Industria Lavatrici, revised 2003.

- **264** – California Department of Water Resources. 2003. California's Groundwater Bulletin 118.

- **266** – Air Quality and Shop Safety Information is Available on the Web, BAR Repair Reporter newsletter, California Department of Consumer Affairs/Bureau of Automotive Repair,  Winter/Spring 2003.

- **268** – Letter from K. Thomson (EST) to  R. Chou (RWQCB), cc M. Bixby re Request for Site Closure, dated March 21, 2003.

- **273** – Letter from M. Tye (EST) to A. Siddiqui (RWQCB), cc Bixby, dated March 18, 2004, with attached Annual Groundwater Monitoring Report No. 1, dated March 11, 2004.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

- **279** – ASTM and the National Clay Pipe Institute – 100 Years of Teamwork and Achievement, Edward J. Sikora, dated August 2004.

- **280** – Letter from J. Au (RWQCB) to M. Bixby re Request for Closure, Crown Cleaners, dated December 10, 2004.

- **281** – Letter from M. Tye (EST) to D. Rasmussen (RWQCB), dated December 16, 2004, re Remediation Section Case Review Form, with attached forms, dated December 8, 2004, and maps.

- **282** – DTSC EPA ID Profile, Manifest, Crown Cleaners, dated December 28, 2004.

- **283** – Letter from (EST) to J. Au (RWQCB) re submission of Work Plan for Groundwater Assessment and Monitoring, dated March 7, 2005.

- **284** – Letter from EST to RWQCB, dated April 4, 2005, with Groundwater Monitoring and Assessment Report, prepared by EST, report dated March 28, 2005.

- **285** – Letter from J. Au (RWQCB) to M. Bixby, dated June 21, 2005 re approval of work re Groundwater Monitoring and Assessment Report, dated March 28, 2005.

- **286** – Letter from  K. Thomson (EST) to P. Raferty (RWQCB) re Remediation Section Case Review Form, dated October 26, 2005.

- **288** – Work Plan for Completion of Groundwater Assessment, prepared by EST, dated December 21, 2005.

- **289** – A Renzacci Solvent Emissions Directive Compliant Drycleaning Machine for a New Installation, Renzacci UK, PLC, 2006.

- **290** – Letter from P. Raftery to M. Bixby, dated January 5, 2006, Re: Response to Groundwater Monitoring Well Installation Work Plan, dated December 21, 2005.

860196

- **291** – Letter to Bixby from RWQCB re Approval of Work Plan to Perform Further Groundwater Assessment, dated May 3, 2006.

- **292** – Letter from P. Raftery (RWQCB) to M. Bixby re Approval of Work Plan to Perform Further Groundwater Assessment, dated May 3, 2006.

- **294** – Letter from K. Thomson (EST) to M. Bixby re Groundwater Assessment Report, dated June 7, 2006.

- **295** – Letter from  K. Thomson (EST) to P. Raferty (RWQCB), dated June 14, 2006,  re Groundwater Assessment Report, prepared by EST, with attached June 7, 2006 Letter and report dated June 6, 2006.

- **296** – The Emergency of Stable Isotopes in Environmental and Forensic Geochemistry Studies: A Review, R. Paul Philp,  dated August 16, 2006.

- **297** – Letter from J. Au (RWQCB) to M. Bixby, dated September 21, 2006,  re Groundwater Monitoring and Assessment Report and Request for Soil Closure, review of report dated June 6, 2006.

- **299** – Study of Potential for Groundwater Contamination from Past Dry Cleaner Operations in Santa Clara County, Santa Clara Valley Water District, Thomas Mohr, 2007.

- **301** – Email chain between E. Jimison and A. Heath (RWQCB), dated February 16, 2007,  re September 21, 2006 letter, extension granted.

- **302** – Letter from E. Jimison (Geosyntec) to A. Heath (RWQCB) and Bixby re Approval of Extension for Submittal of Soil Gas Work Plan, SUC No. 0921, prepared by Geosyntec, dated February 20, 2007.

- **306** – Transmittal/cover sheet from Geosyntec to P. Andes (Allen Matkins) re Post-Remediation Soil Gas Assessment Workplan, dated March 21, 2007, Letter from E. Jimison (Geosyntec) to S. Han (RWQCB) re Post-Remediation Soil Gas Assessment Workplan  .

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

- **307 –** Letter from E. Jimison (Geosyntec) to S. Han (RWQCB), cc EST, Bixby, dated march 29, 2007, re Reprinted Figures for Soil Gas Workplan dated 21 March 2007.

- **308 –** Letter from S. Han (RWQCB) to M. Bixby, dated April 20, 2007, re Conditional Approval of Post-Remediation Soil Gas Assessment Workplan, review of report dated March 21, 2007.

- **309 –** 2007 Annual Groundwater Monitoring Report, prepared by Geosyntec, dated June 11, 2007.

- **310 –** Email from B. Jimison (Geosyntec) to M. Siegel and N. Bice (Geosyntec) re editing and signature for Draft Post-Remediation Soil Gas Assessment Report, dated July 17, 2007.

- **313 –** Letter from A. Castaneda (RWQCB) to G. Gilroy (Bixby), dated September 7, 2007, re Review of Soil Gas Assessment and Groundwater Monitoring Reports, review of reports dated June 11, 2007 and July 27, 2007.

- **317 –** Soil Remedial Action Plan, prepared by Geosyntec, dated October 30, 2007.

- **318 –** Letter from A. Castaneda (RWQCB) to B. Davis (Bixby), dated November 2, 2007, Re: Work Plan Approval, review of reports dated October 9, 2007, September 7, 2007.

- **319 –** Email from L. Lazarus to B. Jimison, N. Bice (Geosyntec), A. Castaneda (RWQCB), dated November 6, 2007, with attached November 2, 2007 letter from A. Castaneda (RWQCB) to B. Davis (Bixby) re Work Plan Approval, review of reports dated October 9, 2007, September 7, 2007.

- **320 –** Letter from T. Egoscue to B. Davis re 2007 – 2008 Annual Estimation Letter for the Site Cleanup Cost Recovery Program, dated November 7, 2007.

- **321 –** Letter from E. Jimison (Geosyntec) and N. Bice (Geosyntec) to A. Castaneda (RWQCB), cc Bixby, dated December 13, 2007, re Request for

Amendment to Additional Groundwater Investigation Work Plan of 9 October 2007, prepared by Geosyntec Consultants.

- **322 –** Email chain between A. Castaneda (RWQCB) and B. Jimison (Geosyntec) re additional borings required due to plume migration down gradient, dated December 14, 2007.

- **323 –** 4th Quarter 2007 Groundwater Monitoring Report (Geosyntec), dated January 15, 2008.

- **324 –** Letter from S. Nowak, Calscience Environmental Laboratories, Inc. (CEL) to B. Jimison (Geosyntec) re enclosed Analytical Report of Samples 012208, dated January 29, 2008.

- **326 –** Email from L. Soos (Geosyntec) to B. Jimison (Geosyntec) and T. Schwartz re summary of visit and file review at City's Building and Safety Department last Thursday, DATED February 18, 2008.

- **327 –** Email chain between A. Siddiqui, A. Castaneda (RWQCB), and B. Jimison (Geosyntec) re approval of work implementation discussed in 02/13/08 meeting, dated March 11, 2008.

- **328 –** Letter from S. Nowak to B. Jimison re enclosed Analytical Report of Samples 032508, prepared by CEL, dated April 3, 2008.

- **344 –** Additional Groundwater Investigation Report, prepared by Geosyntec, dated July 7, 2008.

- **345 –** May 2008 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated July 15, 2008.

- **347 –** Transmittal/cover sheet from E. Jimison (Geosyntec) to N. Amini (RWQCB), cc Bixby re attached December 2008 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated January 15, 2009.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

- **348 –** Letter from T. Egoscue to B. Davis re 2009 – 2010 Annual Estimation Letter for the Site Cleanup Cost Recovery Program –Crown Cleaners, dated July 17, 2009.

- **349 –** June 2009 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated July 31, 2009.

- **350 –** Transmittal/Coversheet from Geosyntec to A. Castaneda (RWQCB) and B. Davis (Bixby), dated July 31, 2009,  with June 2009 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, Well Gauging Data.

- **352 –** December 2009 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated January 20, 2010.

- **355 –** Letter From N. Bice (Geosyntec) to A. Castaneda (RWQCB), dated June 11, 2010, Re: Follow-up to Meeting of 8 June 2010, with attached June 2010 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec Consultants.

- **356 –** Letter from S. Unger (RWQCB) to B. Davis, Re: (2010 – 2011 Annual Estimation Letter for Site Cleanup Cost Recovery Program, dated July 15, 2010.

- **357 –** Letter from S. Unger (RWQCB) to B. Davis. Re: 2010-2011 Annual Estimation Letter for Site Cleanup Cost Recovery Program, Crown Cleaners, dated July 15, 2010.

- **358 –** Transmittal/Cover sheet from E. Mc Donald (Geosyntec) to A. Castaneda (RWQCB), cc Bixby, dated July 30, 2010, with attached June 2010 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec.

- **363 –** Consolidated Sewer Maintenance District, 2011, Sheet C-2030.

- **368 –** Technical Response from Geosyntec to City of Cerritos. dated January 7, 2011, Re: letter Dated 3 December 2010.

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

- **369 –** Transmittal/Coversheet from Geosyntec to A. Castaneda (RWQCB) and B. Davis (Bixby) with December 2010 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated February 2, 2011.

- **370 –** Remedial Action Plan(Geosyntec), dated February 23, 2011.

- **379 –** June 2011 Semi-Annual Groundwater Monitoring Report, prepared by Geosyntec, dated July 13, 2011.

- **389 –** Letter from A. Castaneda to B. Davis re Approval of (Conceptual) Groundwater Remedial Action Plan and Additional Requirements, dated September 15, 2011.

- **399 –** Change of Ownership Notification from Bixby-Lincoln Station to RWQCB, dated October 19, 2011.

- **401 –** Assignment of Ground Lease, Assumption and Consent between Bixby Lincoln Station, Inc. and MGP IX Lincoln Station, LLC, dated October 19, 2011, recorded October 21, 2011.

- **409 –** Analytical Reports from Calscience Environmental Laboratories, Inc., prepared for TOR.

- **411 –** Letter from J. Borum to A. Castaneda re Extension Request, dated October 28, 2011.

- **412 –** Letter to B. Geier from S. Unger (RWQCB) re Site Cleanup Program Oversight Cost Reimbursement Account, Crown Cleaners, dated November 10, 2011.

- **414 –** Acknowledgement of Receipt of Oversight Cost Reimbursement Account Letter (Attachment 4), dated December 20, 2011.

- **415 –** Co-occurrence of 1,4-dioxane with Trichloroethylene in Chlorinated Solvent Groundwater Plumes at US Air Force Installations: Fact or Fiction. Integr Environ. Assess. Manag., R. H. Anderson, J. K. Anderson, P. A. Bower, 8: 731–737. doi: 10.1002/ieam.1306, 2012.

- **417** – Industrial Waste Disposal Permit, Operating Permit-Local Sewer, Los Angeles County Department of Public Works, dated October 25, 2012.

- **420** – Letter to B. Geier from A. Castaneda re Approval of (Conceptual) Groundwater Remedial Action Plan and Additional Requirements, dated June 8, 2012.

- **421** – Letter to B. Geier from S. Unger (RWQCB) re 2012-2013 Annual Estimation Letter for Site Cleanup Cost Recovery Program, Crown Cleaners, dated July 16, 2012.

- **425** – Chlorinated Solvents, Robert D. Morrison, Brian L. Murphy, 2013.

- **436** – Relevant portions of Excel tables, produced by the Sanitation Districts of Los Angeles County, dated October 25, 2013.

- **438** – Plume Figures Showing Recent Sampling Analysis, prepared by J. Dagdigian, various dates.

- **446** – Expert Report of B. Dickson, dated November 18, 2013.

- **452** – Recent documents from RWQCB.

- **454** – Sewer Inspection Video, dated February 24, 2010.

- **455** – Sewer Inspection Video, dated October, 13, 2010.

- **474** – Alpha Scientific analytical results w/sample dates 12/28/12, 1/24/13 and 10/30/13.

- **475** – Cone Penetration Test data from Gregg Drilling 12/27/2012 and 8/26-27/13.

- **476** – CPT 36-43 Boring Logs, 12/27/12.

- **477** – CPT 44-55 Boring Logs, 8/26/13.

- **478** – CPT Site Investigation Report from Gregg Drilling, dated 12/31/12.

- **479** – CPT Site Investigation Report from Gregg Drilling, dated 8/28/13.

- **480** – TOR Phase I Environmental Site Assessment Report (full), dated July 11, 2011.

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

860196

- **481–** Letter from W. Manis (City of Cerritos Redevelopment Agency) to D. Esfandi (County of L.A. Public Works), Re: Closure Permit No. 4589B, dated July 17, 1990.

- **482** – Letter from K. Thomson (EST) to L. Olsen (Bixby), Re: Project Status Report, dated October 9, 1998.

- **483** – Letter from K. Thomson (EST) to T. Klinger (CLAFD), Re: Request for Project Evaluation and Site Closure, dated August 3, 1999.

- **484** – Fax coversheet to K. Clark (CLAFD) to K. Thomson (EST), dated October 15, 1999, with attached Work Plan for Site Assessment, dated October 14, 1999.

- **506** – Lincoln Station Plans prepared by JHH Consultants, 1988.

- **597** – Roto-Rooter, 2010. Parking Lot Sewer Inspection [DVD], August.

- **664** – GIS Map.

- **666** – 3-D Demonstrative Plume Exhibit.

- **704** – Technical Response to City of Cerritos Letter Dated 3 December 2010, prepared by Geosyntec Consultants January 7, 2011.

- **708** – Declaration of Jeffrey Dagdigian In Support of Motion for Partial Summary Judgment.

- **737** – AQMD permit and application papers.

DATED: February 27, 2014                Respectfully submitted,

                                         GLASER WEIL FINK JACOBS
                                           HOWARD AVCHEN & SHAPIRO LLP


                                         By:  /s/ Noah Perch-Ahern
                                           FRED HEATHER
                                           GREGORY MCCLINTOCK
                                           NOAH PERCH-AHERN
                                           Attorneys for Plaintiff
                                           MGP IX LINCOLN
                                           STATION, LLC

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**MGP'S PROFFER OF JEFF DAGDIGIAN'S EXPERT OPINIONS**

860196