GREGORY R. MCCLINTOCK - State Bar No. 43987
gmcclintock@glaserweil.com
FRED D. HEATHER - State Bar No. 110650
fheather@glaserweil.com
NOAH PERCH-AHERN - State Bar No. 262164
nperchahern@glaserweil.com
GLASER WEIL FINK JACOBS
  HOWARD AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:  (310) 556-2920

Attorneys for Plaintiff
MGP IX LINCOLN STATION, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| MGP IX LINCOLN STATION, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CERRITOS, a California, municipal corporation; and DOES 1- 10,<br><br>Defendants.<br><br>———————————————<br><br>CITY OF CERRITOS,<br><br>Counter-Claimant,<br><br>v.<br><br>MGP IX LINCOLN STATION, LLC, a Delaware limited liability company,<br><br>Counter-Defendant. | **Case No. CV12-8239-PA (FFMx)**<br><br>**Assigned to: Hon. Percy Anderson**<br><br>**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN**<br><br><br>**Trial:**<br>Date:        March 25, 2014<br>Time:        9:00 a.m.<br>Courtroom:  15 |

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

## DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN

I, Jeffrey V. Dagdigian, declare:

1.     I am the owner and managing principal of Waterstone Environmental, Inc., an environmental consulting firm based in Anaheim, California.  I have personal knowledge of the matters set forth herein and, if called upon to do so, could and would testify competently thereto.  I make this declaration in lieu of live direct testimony in support of MGP IX Lincoln Station, LLC's ("MGP") claims in this matter.

2.     Based on my education, experience and knowledge with respect to the topics discussed in this declaration, as more fully set forth in my Expert Report and Rebuttal Report submitted in connection with this matter, (**Trial Exhibit Nos. 130, 141**), and the review I have personally conducted of documents and other information pertaining to those topics, I am fully qualified to and, without reservation, offer the following testimony:

3.     I conclude that the property located at 11900 South Street in the City of Cerritos, California, commonly known as the Lincoln Station Shopping Center ("the Property") has been significantly impacted by hazardous substance releases from a sewer line owned and operated by the City of Cerritos ("the City") that is located immediately to the north of the Property underneath South Street ("the South Street Sewer Line") and that the impacts are of such a nature that their remediation is required in order to protect public health and the environment.  I base this conclusion on, among other factors, the following pertinent information:

a)     Based on extensive testing of soil and groundwater conditions, including over 450 groundwater samples collected from the five different water bearing zones closest to the surface that underlie the Property and South Street that have been collected between 1998 and 2013, it is unmistakably clear that the releases originate directly underneath the South Street Sewer Line.  Those releases, which involve primarily tetrachloroethylene ("PCE") and trichloroethylene ("TCE"), but

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

also include 1,4-dioxane ("dioxane"), originate from circumferential and longitudinal cracks in and related defects such as leaking joints in the South Street Sewer Line that have existed for many decades and which have allowed these volatile organic compounds ("VOCs") to escape from the South Street Sewer Line into the underlying trench that houses the South Street Sewer Line, from there find a preferential pathway through the underlying clay and more impermeable soil layers into the underlying groundwater and be carried by the natural flow of the groundwater southward onto and under the Property, where they have been able to find pathways into successively lower water bearing zones. I have prepared figures that demonstrate and visually depict the location of the TCE and PCE plumes, including, for example, Figures 8 through 15 of **Trial Exhibit No. 126**.

b) While historical records are not sufficient to definitively establish with certainty how the VOCs came to be located in the South Street Sewer Line, the most likely and plausible explanation is that the VOCs were discharged or disposed into the South Street Sewer Line by former occupants of the Property as waste products from automotive repair and painting operations that are known to have taken place between about 1949 and 1981 and dry cleaning operations that were conducted on the Property from about 1989 to 1998. While it is conceivable that the VOCs were disposed into the South Street Sewer Line in some other manner, such as by illegal disposal at one of two upstream manholes in the South Street Sewer Line by some unknown third party, the difficulty of doing so and the public nature of such action make it unlikely that it occurred in this manner. There is no other logical explanation for how these VOCs would have come to be located in the South Street Sewer Line and available to leak out of the line through cracks and other defects in that line.

c) To confirm that the South Street Sewer Line is the source of the VOC releases and eliminate the possibility that further upgradient sources might also be contributing to those releases, the most extensive groundwater testing was performed immediately adjacent to the South Street Sewer Line at very close intervals

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  in each of the four closest to surface water bearing zones, shortly downgradient of the
2  South Street Sewer Line along the northern border of the Property, and along the
3  northern edge of South Street upgradient of the South Street Sewer Line.  Based on
4  this extensive testing, it was confirmed that the highest concentrations of all three
5  VOCs were located either immediately under the South Street Sewer Line or shortly
6  downgradient thereof.  Obviously, VOCs become more dilute the longer the time in
7  the groundwater and the further they migrate downgradient in the groundwater.  The
8  is no natural mechanism for VOCs to become more concentrated in groundwater as
9  they travel from the source of release. Thus, the high concentrations under the South
10  Street Sewer Line delineate the sewer line as the source. The "picket fence" of four
11  wells that were located upgradient of the South Sewer Line to detect possible
12  upgradient sources were found to only contain much lower concentrations of the
13  VOCs, in most cases an order of magnitude lower than at the wells further to the
14  south. These lower concentrations in the upgradient well are consistent with
15  molecular diffusion of VOCs from the leak at the sewer line rather than the existence
16  of another upgradient source.

17          d)      Further confirmation that the South Street Sewer Line is the source
18  is provided by the shape of the VOC plumes themselves.  In the immediate vicinity of
19  the South Street Sewer Line, the plumes are very distinct and quite narrow, consistent
20  with being located at the very point of origin.  As the VOC contamination is carried
21  south in the underlying groundwater, the plumes become more dilute and spread both
22  laterally and vertically downward as they intermix with the naturally flowing
23  groundwater.  If there was an additional source of the VOCs further upgradient, the
24  plumes would have a quite different shape.  They would have already begun to spread
25  and lose their very narrow and focused form by the time they arrived at the location of
26  the South Street Sewer Line, but this clearly has not happened.  Such an upgradient
27  source would also have been detected by the picket line of wells that were installed to
28  determine whether such a source existed, but this has not occurred either.  There is no

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

1  way that an upgradient source could have evaded detection by the picket fence of four
2  wells because the wells are closely spaced (they are only 45-60 feet apart).

3         e)     Furthermore, an exhaustive examination of all available agency
4  files and other public information regarding historical use and contamination issues
5  relating to all of the properties located upgradient of the South Street Sewer Line that
6  could potentially have had any impact on the conditions that have been detected in the
7  groundwater failed to reveal any evidence whatsoever of chemical use or presence
8  that could have contributed to the VOC contamination.

9      4.    More specifically, the extensive body of test results and reports that have
10  been compiled and analyzed over the last approximate 18 years with respect to the
11  hazardous substance releases impacting the Property reveal the following:

12      **A.**    **<u>Automotive Maintenance, Repair and Painting Operations at S&J</u>**
13  **<u>Chevrolet.</u>**

14      5.    The Property was farm and ranch land up until about 1949, when it was
15  first commercially developed as an automotive dealership known as S&J Chevrolet
16  ("S&J") (**Trial Exhibit Nos. 146, 154, 192 and 480**).  In addition to a showroom for
17  new cars, the facility included three or four repair and maintenance shops and a paint
18  booth and paint room.  (**Trial Exhibit No. 64, pp. MGP0002154 – 0002156,**
19  **MGP0002169, MGP0002189, MGP0002193, MGP0002195, MGP0002207**).
20  While historical records are sketchy, it appears that the South Street Sewer Line was
21  installed at about the same time as the dealership, has its eastern terminus directly
22  north of the former dealership location and has a lateral connection stub at that
23  location (Lateral A). (**Trial Exhibit No. 63, 64 and 97, p. CITY012574**).  In fact, the
24  sewer line may have been installed to provide service to the dealership given that it
25  was the first commercial development in the area.  While it is conceivable that the
26  dealership initially relied on a septic system for its sewerage needs, we do know that
27  the County of Los Angeles Division of Sanitation issued the facility address an
28  Industrial Waste Disposal Statement which required the disposal of all industrial

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

4

1  wastes to be made by connection to the sanitary sewer. (**Trial Exhibit No. 182**).  In

2  addition, S&J was issued an Industrial Waste Discharge Permit in September of 1976

3  requiring S&J to "continue the program of regular clarifier maintenance and cleaning

4  at intervals frequent enough to prevent a build-up of grit, oil, or grease which may

5  enter the sewer." (**Trial Exhibit Nos. 139 and 187**).  This confirms that, as of that

6  date and for some preceding period, the facility was connected to the City's sewer

7  system.  Because the next closest sewer line would appear to have been located

8  approximately 1,500 feet further to the south and would have required an easement to

9  cross other properties, it is most likely that the dealership was connected to the

10  immediately adjacent South Street Sewer Line.

11       6.  Because TCE was commonly used as a degreasing agent in connection

12  with auto repairs and maintenance, as well as painting operations, during the

13  approximately 30 year period that S&J operated on the Property and dioxane is

14  known to have been used as a stabilizing compound in TCE and other automotive

15  products (e.g. brake fluid) during this time period, it is most likely that waste TCE

16  and dioxane products were occasionally, if not regularly, disposed into the clarifier;

17  floor sinks and drains; or toilets at S&J and from there into a lateral sewer line that

18  was connected to the South Street Sewer Line, shortly upstream of where the cracks

19  and other defects are located in that line. (**Trial Exhibit Nos. 140).**  We do know that

20  S&J's housekeeping procedures were not perfect.  In 1955, it was cited by the Los

21  Angeles County Fire Prevention Bureau for "an illegal and unsafe paint mixing room

22  near a paint spray booth." (**Trial Exhibit No. 64, p. MGP0002169**).  While the

23  records indicate that S&J relocated its operations to the Cerritos Auto Square in about

24  1981 and its Industrial Waste Discharge Permit was voided in 1982 (**Trial Exhibit**

25  **No. 102**),  there is evidence that concrete slabs and some other underground fixtures

26  remained at the Property and S&J continued to use the Property for some purposes up

27  until 1988. (**Trial Exhibit No. 480**).  I therefore conclude that operations at S&J are

28  the most likely source of the TCE and dioxane that have been released from the South

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   Street Sewer Line.

2   **B.    The Crown Cleaners Release.**

3      7.    In 1988, the remaining remnants of the S&J operations were removed
4   from the Property and it was redeveloped into its current configuration as the Lincoln
5   Station Shopping Center. (**Trial Exhibit No. 146, p. MGP0016952**).  One of the
6   initial shopping center tenants was a dry cleaning operation known as Crown
7   Cleaners.  A permit to operate was issued to Crown Cleaners by SCAQMD in
8   December of 1989.  The permit allowed Crown Cleaners to operate a "Synthetic
9   Solvent Dry Cleaning Unit, Renzacci, Model Serena Sun 530, with a built-in
10  Refrigerated Vapor Condenser." (**Trial Exhibit No. 70**).  In addition, Crown
11  Cleaners was issued a permit to install a floor sink in 1989. (**Trial Exhibit No. 71, p.**
12  **MGP0002454**).  Dry cleaning operations using that unit took place between early
13  1990 and August of 1999, when it was removed from the premises and all dry
14  cleaning operations at the Property ceased. (**Trial Exhibit No. 480, p.**
15  **MGP0012853**).  PCE was the primary chemical used in the dry cleaning process.
16  (**Trial Exhibit No. 425, p. 93**).  While there are records that show Crown Cleaners
17  collected the filters infused with waste PCE that had been used in the dry cleaning
18  process in drums which were then manifested and transported off-site for disposal
19  during at least some portion of the time (1995-1999) it was conducting dry cleaning
20  operations (**Trial Exhibit No. 144**), condensate containing small amounts of waste
21  PCE was also being generated by the dry cleaning machine (**Trial Exhibit No. 263**
22  **and 289**) and we know that, like S&J, Crown Cleaners' operations were not
23  contamination free.  In March 1992, the Central Valley Regional Water Quality
24  Control Board issued a report summarizing years of investigation dealing with PCE
25  contamination of municipal drinking wells. (**Trial Exhibit No. 145**).  Among the
26  conclusions made by the Water Board was that the discharge from most dry cleaning
27  units contains primarily water with dissolved PCE, but also contains some pure
28  cleaning solvent and solids containing PCE.  Being heavier than water, PCE settles to

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**
862791

1  the bottom of the sewer line and exfiltrates through it primarily by leaking through
2  joints and cracks in the sewer line.

3       8.    In 1998, Bixby Land Company ("Bixby") became interested in possibly
4  acquiring the ground lease for the Lincoln Station Shopping Center.  In the course of
5  performing pre-acquisition due diligence, Bixby's consultant, Environmental Support
6  Technologies ("EST"), discovered that PCE had been released in the room housing
7  the dry cleaning unit, had penetrated the floor of the room and contaminated the
8  underlying soil.  When Bixby subsequently acquired the ground lease, it installed a
9  vapor extraction system to remediate and remove the resulting soil contamination.
10 (**Trial Exhibit Nos. 215, 224 and 225**).  That process was completed to the
11 satisfaction of the Los Angeles County Fire Department and the extraction system
12 was shut down in 1999.  (**Trial Exhibit No. 227**).  While post-remediation
13 monitoring revealed that groundwater had also been slightly impacted by the release,
14 it is likely that full site closure would have been granted due to insignificant risk if
15 groundwater monitoring in 2000 had not revealed significantly higher levels of PCE
16 in groundwater upgradient of Crown Cleaners indicating the presence of another
17 source.  This discovery resulted in the transfer of regulatory oversight of the
18 contamination to the RWQCB for follow up investigation.  (**Trial Exhibit No. 226**).
19 Under guidance provided by the RWQCB, Bixby conducted additional follow up
20 monitoring of the groundwater from 2000 until 2007.  (**Trial Exhibit No. 230, 232,
21 233, 234, 236, 237, 238, 240, 241, 244, 245, 250, 251, 252, 253, 254, 257, 258, 260,
22 261, 262, 273, 268, 280, 281, 283, 284, 285, 286, 288, 290, 291, 292, 294, 295, and
23 297**).

24     **C.**    <u>**The Groundwater Investigation Conducted by Geosyntec for Bixby.**</u>

25     9.    Based on the discovery that significantly higher levels of VOCs existed
26 in the groundwater upgradient of Crown Cleaners, in September of 2007, the
27 RWQCB requested Bixby to perform a series of additional groundwater investigation
28 tasks in order to evaluate the lateral and vertical extent of the contamination and

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

7

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

attempt to determine its source.  (**Trial Exhibit Nos. 14, 313, 318, 319, 321, 322, 327, and 344**).  That investigation was carried out in three progressive phases based on the results of each prior phase.  The first phase involved the sampling of groundwater along a transect at the southern boundary of the Property to determine whether and at what depth VOC contamination from the suspected upgradient source had extended off of the Property.  This phase established that PCE and TCE levels near the southern boundary were at relatively low levels and not a significant concern.  However, the fact that contaminants were found to be so widespread laterally at the southern boundary suggested a possible additional upgradient source and prompted the need for additional testing. (**Trial Exhibit No. 344, p. GEO0000332 – 0000335; GEO0000348 - 0000349**).

10.   The second phase, conducted in 2008,  involved groundwater sampling in the four near surface water bearing zones along a transect at the northern boundary of the Property to determine whether the upgradient source was located further to the north and potentially off-site.  This phase revealed that significantly elevated levels of PCE and TCE existed at the northern Property boundary, particularly in the third water-bearing zone.  (**Trial Exhibit No. 344, p. GEO0000336 – 0000337; GEO0000348 - 0000349**).

11.   The third phase, also conducted in 2008, consisted of three additional transects, two of which were located in the center of the Property to search for any additional on-site sources (e.g. possible leakage from the Shopping Center lateral sewer lines that connect to the South Street Sewer Line) and define the shape of the contamination plumes originating from the more northerly source, and the third transect consisted of the picket fence line of wells north of the South Street Sewer Line to determine if the source or an additional source existed even further upgradient.  The test results from the third phase established that there was no evidence of an on-site source located upgradient of Crown Cleaners, that the highest concentrations were at the northern Property boundary, just downgradient from the

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

South Street Sewer Line, and that there was no evidence of an additional source even further upgradient to the north of South Street. (**Trial Exhibit No. 344, p. GEO0000337 – 0000338; GEO0000348 - 0000349**).

   **D.**   **The Groundwater Investigation Conducted by TOR Environmental, Inc. for MGP.**

   12.   In October of 2011, MGP acquired the ground lease for the Lincoln Station Shopping Center from Bixby. (**Trial Exhibit No. 401**). As part of that transaction, MGP agreed to voluntarily assume responsibility for completing the investigation and remediation of the groundwater contamination conditions underlying the Property, a responsibility that the RWQCB had assigned to the ground lease tenant as the party with the legal right to occupy the Property for what would be an extended period of time. (**Trial Exhibit No. 156, pp. MGP0006766 – 0006767, ¶14(g)**). In December of 2011, MGP executed an agreement with the RWQCB whereby it obligated itself to reimburse the RWQCB for performing regulatory oversight and review with respect to all investigation and remedial actions taken by MGP with respect to the VOC contamination. (**Trial Exhibit Nos. 399, 413 and 414**).

   13.   Pursuant to its agreement with the RWQCB, TOR has conducted two additional rounds of groundwater sampling to further define the location, extent and shape of the VOC plumes that underlie the Property and assist in the preparation of a proposed Remedial Action Plan and Feasibility Study for remediating the contamination. The first round of sampling involved closely-spaced sampling in the vicinity of the highest PCE and TCE readings that had been detected in groundwater (along the northern boundary of the Property) and at one location in the center of the Property where a slightly elevated TCE detection had been encountered. (**Trial Exhibit No. 159**). The results established that even higher concentrations of PCE and TCE existed at the northern boundary of the Property, particularly in the third water-bearing zone, and that there was no evidence of a separate release at the suspect

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

9

862791

location in the center of the Property.  (**Trial Exhibit Nos. 169, pp. 9-12; 474, 475, 476, and 478**).  Sampling was also initially performed for the presence of dioxane at one location near the center of the Property, which detected dioxane at an elevated level.  (**Trial Exhibit No. 169, p. 9**).

14.    The second round was conducted in August and September of 2013.  It involved the installation of 12 borings, spaced in an approximate 35-foot grid pattern immediately adjacent to the South Street Sewer Line and in two rows downgradient of the sewer line underneath South Street, with groundwater samples separately collected from each of the four upper water-bearing zones.  Continuous core soil samples were also obtained at two locations to better define the water-bearing zones in relation to clay and other more impervious layers in the soil that separate those zones, thereby creating a robust description of the subsurface to aid in designing the most cost-effective approach for remediating the contamination.  The results of this highly intensive testing at the location where the most elevated levels of PCE and TCE have been detected in groundwater confirmed that the highest concentrations of the VOCs are located in a narrow and distinct set of groundwater plumes that originate directly under the South Street Sewer Line, the plumes and the dioxane contamination appear to have been released at the same place and, based on the size and shape of the TCE and PCE plumes, the releases appear to have occurred primarily at different times, consistent with the two different time periods when S&J and Crown Cleaners occupied the Property – the approximately 30-year period between 1949 and the 1980s for S&J and the ten-year period between 1990 and 1999 for Crown Cleaners.  (**Trial Exhibit Nos. 475, 477 and 479**).

15.    More specifically, the TCE plume is approximately 600 feet in length and about 300 feet wide at its widest point and has cascaded from the upper water-bearing zone into each of the three underlying water-bearing zones as it has moved south underneath the Property.  The PCE plume is shorter and narrower but follows the same general pattern of cascading into lower water-bearing zones as it travels

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  south under the property.  The third water-bearing zone has been the most heavily

2  impacted by TCE, with concentrations as high as 14,500 ug/l, compared to the federal

3  drinking water standard or MCL (the highest level that has been deemed safe in

4  potable water), 5 ug/l.  The highest concentrations of PCE have been detected in the

5  second water-bearing zone, at 7,500 ug/l, compared to the MCL for PCE, which has

6  also been set at 5 ug/l.  These are levels of contamination that are obviously of such

7  significance that remedial action is required to protect public health and the

8  environment. (**Trial Exhibit No. 438**).

9        **E.**    **The Nature of and Reasons for the Release Events.**

10      16.    As already observed, the limited available historical records suggest that

11  the South Street Sewer Line was constructed in about 1949 and is therefore now about

12  65 years old.  There is no evidence that it has ever been replaced, modified or repaired

13  during that extended time period.  It is 8 inches in diameter and constructed of

14  vitrified clay pipe, which was manufactured in relatively short three-foot sections that

15  were joined together with either mastic or mortar, brittle materials that can and do

16  deteriorate with time, which there is evidence has occurred in this case.  (**Trial**

17  **Exhibit No. 63**).  Because the sewer line is contained in a manmade trench and

18  located underneath a heavily used public street, the sewer line is exposed to earth

19  settlement, vibration due to the overhead passage of large vehicles and, in Southern

20  California, potential impacts from seismic events that can stress joints and the pipe

21  and cause cracks, breaks and even separations in the line to occur.

22      17.    There is substantial evidence, based primarily upon two video

23  inspections of the South Street Sewer Line that were performed in 2010, that at least

24  three sets of circumferential cracks extend all the way around the South Street Sewer

25  Line and rupture longitudinally in some case to nearby joints at three or more

26  locations within the first 80 feet downstream of the points (lateral stubs A and B)

27  where facilities located on the Property are or were connected to the South Street

28  Sewer Line by lateral lines that served those facilities.  (**Trial Exhibit Nos. 42, 44,**

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

**454 and 455**).  Furthermore, the South Street Sewer Line starts its run immediately north of the Property and runs to the west along South Street.  Other than two covered manholes (Manholes 1 and 2) and the lateral stubs referenced above, there are no other connections to the South Street Sewer Line upstream of the circumferential cracks.  This is significant because the only wastewater entering the sewer system at this point would have been from the Property and been in a fairly limited amount and almost nil at certain times of the day.  The result is that there would have been very little flow in the line, making it less likely that the solvents were sufficiently entrained into and carried by accompanying wastewater in a manner that would reduce the likelihood of leakage.

18.     Equally significant, the South Street Sewer Line is located only about 6 feet below the surface of the street at Manhole 2, which is just upstream of the circumferential cracks and was constructed with a fall (downward slope) of only 0.24%.  (**Trial Exhibit No. 63**).  This is significantly below the general industry standard that existed at the time of construction and below the minimum slope required to assure reasonable self-cleaning velocity of the wastewater in the line that is necessary to prevent clogs, the creation of waste dams and similar effects from grease and waste which can create standing water and increased opportunity for VOCs and other contaminants in the line to leak through cracks and other defects.  This is a particular problem if VOCs are present because PCE and TCE are heavier than wastewater and more viscous, which can cause them to gravitate to the bottom of the sewer line and more readily pass through small cracks, gaps or deteriorated joints in the line that the wastewater, because of its higher viscosity, might tend to remain intact and simply pass over.  In other words, VOCs will preferentially leak from a sewer line and move downward in the underlying soil and groundwater significantly more readily than waste and wastewater.

19.     Evidence that the type of build-ups and clogging referenced above have occurred in the South Street Sewer Line is evident in the video tapes and reinforced

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1  by the fact that the City has been conducting exceptionally frequent cleaning of the
2  South Street Sewer Line for at least 18 years and has labeled the line a "trouble spot"
3  undoubtedly for this very reason.  Unfortunately, such frequent cleaning can also put
4  stress on the sewer line and add to the severity of cracks and defects.

5       20.    Given the age of the South Street Sewer Line, the manner of its
6  construction, the deficient slope of the line, the low flow conditions in this part of the
7  line, the evidence of significant cracking and other defects just downstream of where
8  it connects to the Property, and all of the factors that could contribute to VOC leakage
9  from the line, it is not at all surprising that most if not substantially all of the waste
10  PCE, TCE and dioxane disposed into the South Street Sewer Line would be released
11  into the underlying pipeline trench and find its way into the underlying soil and
12  groundwater shortly after passing Manhole 2, resulting in the narrow and discrete
13  plumes of contamination we see at the Property.  This is the most likely explanation
14  for how these releases have occurred.

15       F.    **Other Confirmatory Evidence that the South Street Sewer Line is**
16  **the Source of the Releases.**

17       21.    The City's experts, Murray  D. Einarson and Charles L. Dutill, II, have
18  posited that there are other possible explanations for the existence of the VOC
19  contamination that would either eliminate the South Street Sewer Line as the source
20  or point to additional upgradient sources.  However, these other explanations are
21  either based on highly speculative assumptions without any factual foundation to
22  support them or are inconsistent with the available evidence.

23       22.    There is no evidence to support the City's argument that the absence of
24  widespread VOC contamination downgradient of the South Street Sewer Line further
25  to the west is inconsistent with the sewer line being the source.

26       f)    As discussed above, the combination of inadequate slope, low
27  flow conditions, heavier VOC gravity and viscosity, along with circumstances
28  conducive to standing water, creation of waste dams, and the existence of cracking

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

1   and defect shortly after wastewater containing VOCs would have entered the South

2   Street Sewer Line result in the unsurprising conclusion that virtually all of the VOCs

3   leaked out of the sewer line within the damaged area located in the first 23 feet of the

4   sewer line downstream of Manhole 2, near where the highest levels of contamination

5   have been detected.

6          g)      In addition, no testing has been performed adjacent to or shortly

7   downgradient of the South Street Sewer Line as it travels west from the location of

8   the known releases.  Absent such testing, there is no way to determine if additional

9   VOC leakage has occurred further downstream in the sewer line and, if so, to what

10  degree.  The very limited data regarding the absence of PCE detections in one water-

11  bearing zone 750 feet further to the west and hundreds of feet south of the sewer line

12  provided by Einarson is far too physically removed and subject to intervening factors

13  to offer any relevant or probative information concerning this issue.

14      23.     There is no evidence to support the City's argument that the lower

15  concentrations of PCE and TCE detected in groundwater north of the South Street

16  Sewer Line cannot be related to a release at the sewer line and must come from an

17  upgradient source.

18          a)      These more northern detections are all at least one order of

19  magnitude lower than the concentrations detected at the South Street Sewer Line or

20  just south of the line.  While the groundwater flow is to the south and almost all of the

21  VOCs that were released into the trench underneath the South Street Sewer Line

22  would, once they had worked their way through the underlying clay lenses and other

23  more impermeable soil layers, mixed with the groundwater and moved south with the

24  groundwater flow, advection and the natural spreading of the VOCs as they

25  encountered the soil would also cause some portion of the VOCs to move in lateral

26  and radiating directions from the release point.  The upgradient water samples were

27  recovered from locations that are only about 40 feet north of the sewer line, the

28  concentrations fall off very rapidly from the much higher levels detected at and south

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

*Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP*

1  of the sewer line and are completely consistent with the soil and groundwater

2  characteristics that are impacting the releases.  If there was a more northerly source,

3  much higher, widespread, and obvious VOC concentrations would have been detected

4  in these northern picket fence wells and the shape of the plumes would be much

5  different than what has been found.

6         b)  If a sewer line leak was the source of the releases, marker products

7  for sewage should be present in the groundwater underlying the Property but such

8  marker products have not been found to exist –More specifically, Einarson posits that

9  trihalomethanes and oxidation/reduction conditions creating an anaerobic (oxygen-

10  lacking) environment, markers indicating the presence of sewage, should be present

11  in the groundwater if leakage from the South Street Sewer line occurred.  It is correct

12  that no evidence of trihalomethanes or oxidation/reduction conditions are present in

13  the groundwater beneath the Property.  There are several reasons for this.  For one,

14  only a relatively small amount of VOCs and a limited volume of wastewater leaked

15  into the groundwater from the sewer line in order to create the plumes that exist at the

16  Property.  Based on a conservative calculation of the mass amount of TCE and PCE

17  that would need to have leaked and reached groundwater in order to create the plumes

18  that exist, I have determined that as little as 5.2 gallons of TCE and 2.5 gallons of

19  PCE is all that would have been required.  Given that the operations that most likely

20  generated those VOC wastes operated on the Property over a combined approximate

21  40 year time span, it is most likely that the VOCs that entered the South Street Sewer

22  line and then leaked out were in relatively small, discrete and occasional amounts that

23  were not significant enough in concentration or volume to mix well with the attendant

24  wastewater and pass over the cracks and other defects in the line along with the more

25  viscous and therefore less leak-prone wastewater.

26         c)  In short, while small amounts of wastewater have no doubt also

27  leaked from the South Street Sewer Line, the amount is almost infinitesimal when

28  compared with the large volumes of water that were passing by in the underlying

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

1  groundwater during those 40 years and completely insufficient in volume to create

2  any kind of a marker in the groundwater or change its aerobic condition. In addition,

3  studies conducted in England and elsewhere have confirmed that the levels of

4  trihalomethanes that are likely to have existed in wastewater in Cerritos were at such

5  a low level that their existence or non-existence in the groundwater would be

6  undetectable. (**Trial Exhibit No. 203 and 216**). The most likely scenario is that

7  relatively small amounts of VOCs preferentially leaked from the South Street Sewer

8  Line, contaminating the underlying soil and groundwater over many decades, along

9  with small amounts of wastewater that was way too little in volume to leave any kind

10  of evidence of its existence behind in the groundwater.

11      24.    There is no evidence to support the City's argument that there are

12  upgradient facilities that could have released the TCE and PCE into the groundwater

13  that have not been ruled out as sources by the existing groundwater investigations.

14      a)    There are only two nearby upgradient facilities that realistically

15  are located in positions where groundwater flow beneath those facilities could have

16  traveled to the locations where the evidence shows the plumes exist. Both of those

17  facilities are sufficiently further to the north that a release at either facility would have

18  been picked up and identified by the picket line of wells north of the South Street

19  Sewer Line. No such detections have occurred.

20      b)    Furthermore, they are sufficiently further to the north that, if a

21  release had occurred at one of these facilities, the width, strength and shape of the

22  VOC plumes in the vicinity of the South Street Sewer line would be quite different

23  than they are. But to be certain that these facilities have not played some, even

24  limited, role in the contamination, I have thoroughly and carefully reviewed all

25  available historical and environmental records regarding these two facilities for any

26  indications of VOC use, handling or storage activities. No such evidence exists.

27      c)    The two facilities involved are an egg farm, which may have

28  stored chicken feed on its property during the period of the 1940s to 1986. (**Trial**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

16

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

1    **Exhibit No. 192**).  Einarson suggests that there may have been silos on the property

2    that stored grain and that VOCs might have been used as a fumigant or degreaser in

3    connection with such operations.  But there is no evidence to support this hypothesis

4    and the only reported discharges have been egg shells, which were discharged to the

5    South Street Sewer Line at a point further to the west.  The other facility is a railroad

6    side track or spur that is located a considerable distance further upgradient to the

7    north.  The type of operations conducted at this spur and when they were conducted is

8    unknown but there is not one iota of evidence that the operations involved the

9    loading, unloading or management of TCE and PCE, which might somehow have

10   involved spills or leaks.

11           d)    Einarson's theory that these other facilities could have been

12   involved is based on nothing more than looking at a business directory and

13   concluding from the name of the business that almost anything is possible, therefore it

14   cannot be ruled out.  Again, the most likely explanation for the releases that have

15   impacted the Property are disposals or discharges of waste TCE and PCE into the

16   South Street Sewer Line at S&J and Crown Cleaners during their long periods of

17   occupancy at the Property and the subsequent leakage of those VOCs from the

18   circumferential cracks and related defects shortly downstream of where those

19   facilities hooked into the sewer line.  There simply is no other reasonable explanation.

20           25.    There is no evidence to support the City's argument that the plumes may

21   have resulted, at least in part, from northern (against the groundwater gradient)

22   migration of VOC leaks from the on-site lateral sewer lines.

23           a)    While it appears the City's experts may have now abandoned this

24   contention based on the evidence, two rounds of lateral video inspections and the

25   groundwater investigation results from the middle of the Property have established

26   that there is no evidence of leakage from an on-site lateral sewer line.  (**Trial Exhibit**

27   **Nos. 597, 453 and 658**).  Those tests have also established that the current laterals,

28   which were installed in 1989 when the shopping center was constructed, are

17

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

1   composed of ABS piping, a superior sewer pipe material that comes in much longer

2   sections, has more durability and better containment characteristics, and is sealed by

3   joint materials that are much more flexible, less brittle and less susceptible to

4   deterioration.

5           b)      Furthermore, contrary to Einarson's suggestion, the relatively low

6   concentrations and small amounts of waste PCE that would have been conveyed

7   through these lateral pipes are not likely to have resulted in any damage to the joint

8   materials; nor is there any evidence that this has occurred.  Equally as important, the

9   concept that PCE could have somehow traveled through the soil, along the bottom of

10  a lateral trench, or on top of the groundwater or soil lenses for hundreds of feet

11  upgradient to the location of the South Street Sewer Line to cause the releases that

12  have been identified at that location totally defies the laws of physics – it couldn't

13  have happened.

14          26.     There is no evidence to support the City's argument that the shape of the

15  plumes in the vicinity of the South Street Sewer Line is not consistent with leakage

16  from the cracks and other defects that exist shortly downstream of Manhole 2.

17          a)      Based on the groundwater testing results obtained before TOR

18  conducted its 2012 and 2013 intensive groundwater testing adjacent to and

19  immediately downgradient of the South Street Sewer Line, as well as in the vicinity

20  of the one anomaly in the middle of the Property, Dutill has asserted in his expert

21  report that the shape of the plume would require that leakage must also have occurred

22  from an on-site lateral and at upstream locations in the South Street Sewer Line,

23  between Manhole 1 and 2, as well as at Lateral A.  However, the more recent testing

24  has dispelled the existence of an on-site source and made crystal clear that the highest

25  concentrations and the plumes' origination point is approximately 35 feet west of

26  Manhole 2 and very close to the location where VOCs would have leaked out of the

27  circumferential cracks and other defects found at that location, not further to the east

28  as posited by Dutill.  While it is not of great significance whether the VOCs were

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

862791

1  released from the South Street Sewer Line a short distance further to the west or to the
2  east, as Dutill postulates – the release was still from the sewer line – it is much more
3  likely that the defects west of Manhole 2 are the origination point and that, once
4  released from the sewer line, the VOCs traveled for only a brief distance (a few feet)
5  along the bottom of the sewer pipe trench before finding a preferential path through
6  the underlying soil and into the groundwater.

7          b)     The City knew or should have known that VOCs would be
8  discharged into the City's sewer system and that they could be released into the
9  environment through cracks and other defects in that system.  Among other pertinent
10 facts, the City reviewed and approved Crown Cleaners' construction plans and
11 allowed Crown Cleaners to install and operate a dry cleaning machine at the Property
12 without imposing any requirements relating to PCE discharges to the sewer system.
13 (**Trial Exhibit No. 71**).  Nor, despite its city ordinance recognizing the risk, is there
14 any evidence that the City ever inspected Crown Cleaners to verify that it was
15 handling PCE in a manner that would prevent contamination.  Due to this failure and
16 but for the pre-acquisition due diligence investigation conducted by EST for Bixby in
17 1998, the presence of a PCE release at Crown Cleaners and the steps that were taken
18 by Bixby to investigate and remediate that release most likely would not have
19 occurred, adding to the contamination problems that currently exist at the Property.
20 Furthermore, during the time that Crown Cleaners was conducting dry cleaning
21 operations at the Property, it was common knowledge among municipal sewer
22 permitting, management and maintenance personnel that dry cleaning operations
23 could result in PCE discharges into the sewer system that could impact groundwater
24 through leakage from cracks and other defects in the sewer system and that this was a
25 significant problem associated with dry cleaning operations in general.  This was
26 summarized in the March1992 RWQCB Report which pointed out that PCE leaks
27 from sewers were causing impact to groundwater. (**Trial Exhibit No. 145**).  Yet the
28 City took no action to protect against such risks.

Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP

19

**DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD**

27.     The response to the release at Crown Cleaners by Bixby, the extensive investigation of soil and groundwater conditions at the Property and upgradient thereof, the development and bench-testing of remedial alternatives for addressing the contamination and the effort that is currently underway to prepare a proposed RAP and Feasibility Study that can be used to select the appropriate remedy for the groundwater contamination have all been performed under the oversight and direction of the LACFD and, after groundwater contamination was discovered, the RWQCB and have been performed in a manner that is consistent with those agencies' requests and requirements. Given the levels of VOC contamination in the groundwater underneath the Property, those actions have been and are necessary to protect public health and the environment and are being performed in a manner that substantially complies with the NCP. (**Trial Exhibit Nos. 13, 14, 16, 17, 137, 138, 143, 159, 160, 164, 169, 170, 209, 215, 224, 225, 232, 233, 234, 236, 237, 238, 239, 240, 241, 242, 245, 246, 250, 251, 252, 253, 254, 257, 268, 280, 301, 302, 306, 307, 309, 313, 317, 318, 321, 322, 323, 327, 344, 345, 347, 350, 352, 355, 358, 369, 379, 389, 432, 474, 475, 476, 477, 478 and 479**).

28.     Based on my review and evaluation of the invoices associated with Bixby's and MGP's response actions at the Property to date, including those for oversight reimbursement costs paid to the reviewing regulatory agencies, I have determined that at least $1,236,142 have been incurred in performing those actions and that the costs have been necessary and reasonable in amount given the complex nature of the environmental issues involved. (**Trial Exhibit Nos. 148, 149, 229, 249, 320, 348, 356, 357, 412, 421** ).

29.     Based on the extensive site characterization activities that have taken place  at the Property to date, the types and quantities of contaminants that are present in the groundwater, the work, including bench-scale testing of potential remedial alternatives, that has already been conducted, and the preliminary results of the on-going feasibility analysis, it is my opinion that the level of response costs that will

Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP

DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD

862791

1  need to be incurred in the future in order to design and implement the groundwater
2  remediation and post-remediation confirmatory monitoring program and obtain site
3  closure in a manner that is consistent with NCP requirements could easily exceed
4  $9,600,000.  (**Trial Exhibit No. 148**).  This figure excludes the cost of any additional
5  groundwater investigation that may be appropriate and necessary to further define the
6  precise location of VOC contamination in order to optimize the remedial design,
7  which is currently undefined but could also be substantial.

8      30.    A number of demonstrative exhibits have been prepared that will assist
9  the Court in understanding some of the testimony above.  When called at trial, I
10  intend to rely on and/or utilize those exhibits in connection with my testimony.

12      I declare under penalty of perjury under the laws of the United States of
13  America and the State of California that the foregoing is true and correct.

15      Executed this 11th day of March, 2014, at _Fullerton_ , California.

18  _Jeffrey V. Dagdigian_
19  JEFFREY V. DAGDIGIAN, PhD

Glaser Weil Fink Jacobs
Howard Avchen & Shapiro LLP

DECLARATION OF DIRECT TESTIMONY OF JEFFREY V. DAGDIGIAN, PHD

862791